CHESAPEAKE & O. R. CO. v. McKELL.

(Circuit Court of Appeals, Sixth Circuit. December 2, 1913.)

No. 2357.

1. TRIAL (§ 177*)—REQUESTS FOR INSTRUCTIONS—EFFECT OF MUTUAL REQUESTS.

Requests by both parties for an instructed verdict do not amount to a withdrawal of all questions of fact from the jury, where it appears that such was not the intention of a party, and that it was not so understood by the court.

[Ed. Note.—For other cases, see Trial, Cent. Dig. § 400; Dec. Dig. § 177.*]

2. APPEAL AND ERROR (§ 1097*)—REVIEW—SUBSEQUENT APPEALS—SCOPE AND EXTENT OF REVIEW.

While an appellate court has the abstract power upon a second review to reach a result inconsistent with its decision on the first review of the same case, this power is to be exercised very sparingly, and only under extraordinary conditions.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 4358–4368, 4427; Dec. Dig. § 1097.*]

3. CORPORATIONS (§ 390*)—VALIDITY OF CONTRACTS—ULTRA VIRES—QUESTIONS FOR JURY.

Where one contracts to sell to a corporation an article which it has power to buy for one purpose, but has no power to buy for another, the criterion of the validity of the contract in a suit by the seller is twofold: First, did the purchaser buy with a dominant unlawful purpose, and only for incidental use in the rightful way, or with a dominant lawful purpose, intending to devote to the unlawful use only the contingent surplus; and, second, if its purpose was dominantly unlawful, was this with the knowl-

---

edge of the seller, or did the latter suppose, and have the right to suppose, that the purchaser was buying mainly and substantially for the lawful purpose? and the latter inquiry is attended with the presumption, in the absence of contrary evidence, that he did not know of any unlawful purpose; but, where there is such contrary evidence, the question is one for the jury.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 1572; Dec. Dig. § 390.*]

4. CONTRACTS (§ 323*)—ACTIONS FOR BREACH—QUESTIONS FOR JURY.
In an action for breach of a contract by which defendant railroad company agreed to purchase at stated prices so much of the coal to be mined from certain land owned by the plaintiff as he should elect to sell to it, in which he alleged an election to sell the entire output, whereby defendant's obligation to take it all became fixed, the question whether he made an election, and, if so, whether it extended to all or only a part of the coal, *held*, on the evidence, questions for the jury.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 1311, 1349, 1466, 1543–1548, 1827, 1827½; Dec. Dig. § 323.*]

5. DAMAGES (§ 218*)—BREACH OF CONTRACT—CONTRACT FOR SALE OF COAL PRODUCTION.
In an action by coal land owner against railroad company, on latter's contract to build railroad to the land and buy from the owner or his lessees all the coal to be mined thereon, and where it appears that the railroad company built the road, that the owner leased portions for a tonnage royalty under leases contemplating that the lessees would exhaust the coal, and the owner retained other portions which he was at liberty to lease or to operate himself, and it further appeared that, after taking some coal from the lessees, the railroad refused to take more, the measure of damages as to the leased lands was the diminution of the present value of the owners' expectant royalties through their definite or indefinite postponement in so far as such postponement was the reasonably probable result of the defendant's refusal to take the coal as agreed, while, as to the lands not leased, the contract must be treated as in the nature of a development or operating facility—a quasi appurtenance to the land—and the measure of damages will be the difference between the value of the unleased tract with the full contract in force and its value with the railroad built and the remainder of the coal-purchasing contract repudiated.

[Ed. Note.—For other cases, see Damages, Cent. Dig. §§ 560–562; Dec. Dig. § 218.*]

In Error to the District Court of the United States for the Western Division of the Southern District of Ohio; Howard H. Hollister, Judge.

Action at law by Jean D. McKell, administratrix, against the Chesapeake and Ohio Railroad Company. Judgment for plaintiff, and defendant brings error. Reversed.

For former opinions, see 175 Fed. 321, 99 C. C. A. 109, 20 Ann. Cas. 1097; 186 Fed. 39, 108 C. C. A. 141.

Harmon, Colston, Goldsmith & Hoadly, of Cincinnati, Ohio (F. B. Enslow, of Huntington, W. Va., of counsel), for plaintiff in error.

Brown, Jackson & Knight, of Charleston, W. Va., Paxton, Warrington & Seasongood, of Cincinnati, Ohio, and Holt, Duncan & Holt, of Huntington, W. Va. (John H. Holt, of Huntington, W. Va., and Murray Seasongood, of Cincinnati, Ohio, of counsel), for defendant in error.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Before KNAPPEN and DENISON, Circuit Judges, and McCALL, District Judge.

DENISON, Circuit Judge. Upon the first trial of this case, judgment was entered for defendant (the railway company) upon an instructed verdict. This court reversed the judgment and ordered a new trial. Our former opinions (on first hearing, 175 Fed. 321, 99 C. C. A. 109, 20 Ann. Cas. 1097, on rehearing, 186 Fed. 39, 108 C. C. A. 141) sufficiently state the nature and history of the controversy. Upon the new trial thus awarded, the District Court instructed the jury that the making of the contract, its validity, and its breach were established as matter of law, and left for the consideration of the jury only the amount of damages. The verdict fixed plaintiff's damages at $300,000, and defendant brings error to review the judgment entered thereon.

[1] It is urged that, by requests from both plaintiff and defendant for instructed verdicts, the facts were submitted to the court under the rule of Beuttell v. Magone, 157 U. S. 154, 15 Sup. Ct. 566, 39 L. Ed. 654, and so that some of the errors assigned cannot now be considered; but we are satisfied there was no intent by the court or by defendant's counsel to treat the facts as voluntarily withdrawn from the jury, and that what happened on the trial brings this case within the rule which we have applied in Minahan v. Grand Trunk Co., 138 Fed. 37, 42, 70 C. C. A. 463, and in Bank v. Maines, 183 Fed. 37, 41, 105 C. C. A. 329.

The assignments of error are very numerous, but, so far as we think they require consideration at this time, they may all be included in groups as presenting these questions: (1) What are the extent and effect of the former judgment of this court? (2) was the contract in suit ultra vires of the railroad company so as to defeat McKell's action? (3) was the contract in suit ever closed by McKell's exercise of his optional right to sell to the railroad all the coal on his land? (4) if there was a valid and completed contract, did its breach appear? and (5) if there were such contract and breach, what was the measure of damages?

1. *The Former Decision.* Counsel urge, in effect, that the only question involved upon the former review was whether there was evidence to go to the jury, that the only point actually decided was to affirm the existence of such evidence, and that, in so far as the opinion of the court went further and declared the character of the contract indicated by the evidence and the duration of rights created by the contract, it was obiter; and they further urge that we are at liberty to and should re-examine the rightfulness of our former conclusions.

[2] We find no occasion to doubt the abstract power of an appellate court, upon a second review, to reach a result inconsistent with its decision on the first review of the same case (Messinger v. Anderson, 225 U. S. 436, 444, 32 Sup. Ct. 739, 56 L. Ed. 1152); but this is a power to be exercised very sparingly, and only under extraordinary conditions. The practice that such a decision be treated as the law of the case, to be followed by the appellate court itself as well as by the trial court, is most salutary, and its violation (save in rare exceptions) would intolerably unsettle all litigation. Such practice, indeed, "is necessary to

enable an appellate court to perform its duties satisfactorily and efficiently." Great Western Co. v. Burnham, 162 U. S. 339, 344, 16 Sup. Ct. 850, 40 L. Ed. 991.

We should, then, consider just what was determined in the former opinion. We cannot accept the contention that everything was obiter which went beyond the finding that it was error to take the case from the jury. In the question whether the evidence in this case tended to show any contract, there was properly involved the question of the character and extent of the contract, and what the court found upon the latter question constituted, in part at least, the basis for its conclusion upon the former, and became a part of the law of the case for the guidance of the trial court in the directed new trial. In re Sanford Co., 160 U. S. 247, 16 Sup. Ct. 291, 40 L. Ed. 414; Jones v. Habersham, 107 U. S. 174, 179, 2 Sup. Ct. 336, 27 L. Ed. 401.

Approaching the former opinion from this standpoint, we think it clear that the points decided upon this subject (and not hereinafter specially treated) were three: First, that the contract made by the letters was not one contingent upon the making of future contracts with lessees, but was complete in itself, and gave to McKell the option to sell to the railroad all the coal to be mined on his land, with the privilege of exercising the option in installments from time to time; second, that the contract was not at will, but was "permanent," and contemplated that rights created under it might continue until all the coal was exhausted (subject, doubtless, to the condition that the rights of election and delivery should be exercised in a reasonable manner); and, third, that McKell's election might be made and his rights consummated, through his lessees as well as by himself directly. Whatever doubts any members of this court might now feel as to whether the nature of the contract was in all these respects rightly apprehended in the former opinion, we know that these questions were then thoroughly presented and thoroughly considered, and we all agree that such doubts cannot justify any present refusal or hesitation in accepting and following the construction then given.

2. *Was the Contract Ultra Vires?* The railroad is a Virginia and West Virginia corporation, subject to the laws of those states, and chartered only as a common carrier, without merchandizing power. The contract here involved was a West Virginia contract. In 1895 (Acts 1895, c. 16) a West Virginia statute was enacted which forbade railroad companies to engage in the business of buying and selling coal. While this statute was passed later than the making of the contract, yet the railroad was always an interstate carrier, and it is clear that, if it was in fact purchasing coal for the purpose of resale, such shipment and resale were to be outside of the state. It has been authoritatively decided that interstate carriers cannot buy coal for that purpose, where the necessary effect is to substitute a dealer's profit for the published rate (New Haven Co. v. I. C. Com'n, 200 U. S. 361, 26 Sup. Ct. 272, 50 L. Ed. 515), and such substitution would, we think, have been the necessary effect of this contract, considered as one of purchase for resale. Hence, at the time the contract was made, in 1892, and without reference to the West Virginia statute of 1895 or

the Hepburn Act of June 29, 1906, c. 3591, 34 Stat. 584 (U. S. Comp. St. Supp. 1911, p. 1288), the railroad company had no power to contract with McKell to buy his coal for the purpose of selling the same at a profit; indeed, we do not understand that the existence of such a power is seriously claimed.

[3] However, the railroad was a large user of coal for its own fuel. It had power to buy and to contract for coal for this purpose. What follows? Where one contracts to sell to a corporation which has power to buy for one purpose, but has no power to buy for another purpose, the criterion of validity in the suit of the vendor is twofold: First, did the vendee buy with a dominant unlawful purpose, and for only incidental use in the rightful way, or with a dominant lawful purpose, intending to devote to the wrongful use only the contingent surplus: and, second, if the vendee's purpose was dominantly unlawful, was this with the knowledge of the vendor, or did the latter suppose, or have the right to suppose, that the vendee was buying mainly and substantially for the rightful use? This latter inquiry would be attended with the presumption, in the absence of any contrary evidence, that the vendor did not know of any unlawful purpose. Miners' Co. v. Zellerbach, 37. Cal. (per Sawyer, C. J.) 543, 586–588, 99 Am. Dec. 300; Colorado Co. v. American Co. (C. C. A. 8) 97 Fed. 843, 849, 38 C. C. A. 433; Young v. United Co. (C. C. A. 1) 198 Fed. 593, 117 C. C. A. 301.

Both these questions are questions of fact, and we are satisfied that the present record requires that the first, and, if that is answered in one way, then the second, should be submitted to the jury. The theory of the present case is not that some small amounts of coal were contracted for, but that the railroad company obligated itself to take nearly 100,000,-000 tons. True, deliveries were indefinite, and were, doubtless, subject to considerations of what would be reasonable, but if the contract declared upon was ever closed by McKell's election to sell, both parties had in mind the entire amount, and the inquiry as to the railroad's purpose in buying and McKell's knowledge of that purpose, must be approached from this standpoint. There was evidence, given or offered, tending to show that the railroad was notoriously buying and selling coal on a great scale; that its fuel needs, as existing in 1892, upon the divisions most naturally supplied from this region, could have been met for 300 years by the quantity contracted for, while even its total uses, in 1909, after a development perhaps beyond any one's contemplation in 1892, would have been covered for more than 50 years; that the contract price was higher than it was then paying for its fuel; and that McKell's business situation and experience were such as to support an inference that he must have known the railroad was buying for shipment and sale. Further, the letters and testimony tend to show that the coal about which he and the railroad president were corresponding, was, by both of them, expected to be sold in a competitive market. On the contrary, inference and testimony to the effect that McKell had no knowledge of an intended unlawful use are not wanting.

On the whole record we have no doubt that the defendant was entitled to go to the jury upon the propositions that it bought this coal for the main purpose of shipment and resale, and that McKell was

chargeable with full knowledge of such purpose, and that, if the jury, found with defendant on these propositions, there could be no recovery.

The former opinion does not cover this point. It decides only, and we think it was intended only to say, that, upon the then existing record, the defense of ultra vires was not so made out that it would, as matter of law, defeat the action; but whether there was evidence tending to show the unlawful purpose and McKell's participation was neither involved nor discussed.

[4] 3. *Election.* Plaintiff declared upon a contract which obligated the railroad company to buy all the coal which, from time to time thereafter, McKell should elect to sell, followed by his election to sell thereunder all his coal. Under this declaration, and under the theory on which the case was twice tried, McKell's right to recover depended upon the due exercise of his election to sell all the coal. Upon the first trial, plaintiff made an offer to prove such complete election, but he was not permitted to make the proof. The case, therefore, necessarily came into this court on a record implying that the election had been made, and its consideration here was upon that basis. This was not only the necessary implication from the record, but it was expressly mentioned in the opinion, and everything said in the opinion is upon the declared hypothesis that the plaintiff would be able to show, and for the purposes of that discussion must be considered as having shown, a complete election. The question whether the facts which did appear by proof, and not merely by offer, made out, of themselves, as matter of law, the necessary election, was not before the court, and we think was not intended to be decided. Whatever is said that may seem to have that color is only by way of argument in demonstrating that there was a case for the jury, and cannot have the force of a decision. So it becomes necessary for us to examine the question, as an open one, whether the evidence on this trial showed such election so clearly and so conclusively as to justify the instruction given.

To comprehend clearly the issue of election, some segregation seems necessary, first, broadly, as to the lands involved. The 23,000-acre tract was underlaid with two seams of coal—the Sewell and the Fire Creek seams—but not completely by each, so that the Sewell seam existed under only about 11,500 acres. The declaration charges the contract and the election as to all the coal. Testimony was received concerning the diminished value per acre of the 23,000-acre tract by reason of the breach; but counsel now agree that only the 11,500 acres underlaid with the Sewell seam were in fact involved. If so, this testimony was improperly received. So, also, we do not observe any evidences of general election to sell coal which do not apply to both seams as well as to one, or which cover either if they do not cover both. We do not understand how this confusion arose, but it is not necessary to pursue the subject, for we may assume that it will be cleared up on another trial.

Then we find that the coal lands containing the Sewell seam require division into two groups: Those which were at the time of the breach covered by leasing contracts and those not so covered. Within the first two years, and before there was a final breach, McKell had leased four

subtracts to four lessees on a fixed tonnage royalty, and three of these lessees had made individual sale contracts with the railroad. These three leases contain about 2,400 acres; the fourth lease covered 600 acres; a total of 3,000 acres. Each of these leases was for 25 years, and indicates that both parties thought this period reasonably sufficient to exhaust the coal in the leased premises; none contained any restriction on the lessees' right to sell the coal to any one. The three contracts by the lessees with the railroad are similar to each other in terms, are for a 10-year period only, and obligate the lessee to sell and the railroad to take a yearly amount. They clearly leave the lessees at liberty to sell on the general market all their annual product beyond the stated amount, and all their product after 10 years. The total tonnage so sold to the railroad, on this 2,400 acres, could not exceed 6,000,000 tons, which would exhaust the coal on not more than 1,000 acres.[1] We cannot see that these leases or contracts, standing by themselves, tend to show an election by McKell to sell to the railroad any more than the total stipulated tonnage for the 10-year period.

Whether there still remained for McKell's benefit an open right of election to sell to the railroad, through these lessees, all the remaining coal on the leased premises, beyond the 6,000,000 tons sold, such right to be exercised within some reasonable limits of time and conditions, or whether the leases or sales contracts, or both, were necessarily inconsistent with such further open right, or whether the three sales contracts were made and taken by all parties as, pro tanto, satisfaction of, and substitution for, the open contract—these queries we need not consider. We now decide only that the four leases and the three sales contracts did constitute an election by McKell to sell the coal on 1,000 acres, but did not, of themselves, amount to an offer or election to sell the coal on the remaining 2,000 acres of the leased lands.

As to the coal on the remaining 8,500 acres of the Sewell seam, or the remaining coal on the 3,000 acres, we find nowhere any clear and certain election to sell. If the railroad arbitrarily refused to make contracts with the lessees for all their coal, and wrongfully held these purchase contracts down to the specified 6,000,000 tons, such conduct might have been a breach of the existing open contract, but it could not have been the election by McKell to sell the remainder. To say that such refusal (if there was a refusal) was wrongful assumes that there had been a prior election to sell the whole; it cannot, at the same time, close the contract and be the breach. McKell wrote a letter on April 20, 1893, before any one of the four leases was made, in which he says that he will "refuse leases to any not willing to contract to railroad." In view of his almost contemporaneous conduct in giving those leases which he did make, this language is not necessarily to be interpreted as pledging him not to lease except to those who would sell to the railroads their entire output. Still less does it fix his conclusion not himself to sell in the general market any coal that might not be covered by lease. His counsel also seek to make out the requisite election by notices given and offers made by him in 1901, six years after the al-

---

[1] This estimate, and our other recitals of acreage or tonnage, are intended as illustrative—not necessarily as accurate.

leged breach and while his claim was in the attorneys' hands for prosecution; but, giving to these things their face value, they do not expressly declare a present intention, nor recite a past conclusion to fix upon all the coal on all his land a status as "sold to the railroad." The question may be clearer, if seen from the other side. If McKell had elected to sell all the coal to the railroad under the contract which gave him that right, then the status of the coal was fixed (at least for the time being), and while the situation so remained, McKell would have no right to sell any of it to any one else. If he had made such a sale, the railroad could have brought an action against him, and in such action it would be entitled to an instruction in its favor on the same evidence which would entitle McKell to the corresponding instruction in the present, converse case. We are satisfied that neither the items of evidence to which we have referred nor others argued in the briefs, nor all together, would have entitled the railroad, in the supposed action, or did entitle McKell in this action, to an instruction that, as matter of law, his election to sell all the coal was established.

Counsel for the railroad go further and argue that none of this evidence has any lawful tendency to establish the election in controversy. We do not think it advisable to determine this, both because the point has not been fully argued upon the other side, and because the record upon a new trial may not be the same. Nor is it necessary to consider what the situation will be if it may eventually turn out that McKell had elected to sell a part but not all of the coal. In such case, it might be thought that, as to part of the coal there had been a closed contract of sale, a breach by not taking as agreed and damages appropriate to that situation, while, as to the remainder of the coal there had been only an open contract to take what might thereafter be offered, an anticipatory breach and damages naturally flowing therefrom. In such event, some amendment of the pleadings would seem necessary, and might or might not be proper to permit. We intend to express no opinion on these subjects, but only to make clear that any such rights cannot be worked out at this time on this record.

4. *Breach.* In observing whether the undisputed facts constituted a breach of the contract so as to justify the instruction to that effect which was given, we must keep in mind the contract involved. Upon the theory on which the case was prepared and submitted, viz., that the open contract had been closed by McKell's complete election to sell all the coal, whereby the obligation of the railroad company had become fixed to take all the coal as it should thereafter be reasonably offered for delivery—upon this theory, we think the breach did appear without doubt. After making sale contracts with three lessees, the railroad company announced that it would make such a contract with one more lessee only, and it thereafter consistently refused to receive more coal, and wholly denied its obligation under this theory of the contract.

The alleged failure of the railroad to furnish cars to the various lessees was much discussed in the court below, and defendant was refused permission to show that it had a reasonable supply of coal cars, and that it had distributed them without discrimination among its shippers, including the lessees. This refusal is alleged as error. On

the other hand, such failure is said to be a breach of the contract. The whole subject seems to us practically immaterial. We agree with the court below that if this contract is to be treated as one for the purchase by the railroad company of its fuel coal, it implied the liability to furnish cars, and that the railroad's failure to provide cars to take away the fuel which it had bought and agreed to take when offered would be a breach of such contract, and that the full performance of defendant's duties as a common carrier in impartially distributing a fair supply of cars would be no answer to the breach; but the complete breach already existed, the railroad company continued to refuse to take any coal, and denied its liability to do so (beyond the supposed 6,000,000 tons). It never claimed the right or sought an opportunity to reconsider this conclusion and to change its position. In this situation, evidence of the car refusals adds nothing to plaintiff's case.

If this trial had been, or a subsequent trial should be, upon the other theory heretofore suggested, viz., that as to part of the lands, the contract remained open, and it was the duty of the railroad company from time to time, either to buy coal or furnish the agreed facilities for shipment as the shippers might, from time to time, elect, then the contract obligation apparently would continue in both forms; the contract duty to furnish cars might extend to the coal which the shippers were compelled to send into the general market by the railroad's refusal to take, as well as to coal which the shippers elected, in the first instance, to ship; and the question might arise how far the contract obligation to furnish cars for general shipment did or could supersede defendant's obligations as a common carrier—but this line of inquiry is now premature.

[5] 5. *Damages.* The measure of damages, adopted in the court below, was the difference between the value of McKell's land in connection with and accompanied by a contract of this kind and the value of the land with the railroad, but without such contract, and the jury was permitted to apply this measure of damages to the entire tract, or, at least, to the entire 11,500 acres of the Sewell seam. The intention of the court below was to adopt and apply the rule of damages stated by this court in the case of South Memphis Land Co. v. McLean Hardwood Lumber Co., 179 Fed. 417, 102 C. C. A. 563.

Upon the subject of damages, as well as upon the subject of election, it seems difficult to treat the entire claim as an entity. The lands must be divided into two classes. The first class consists of the 3,000 acres which had been set apart by McKell before the alleged breach into the hands of lessees. Their right to mine all the coal in these tracts was fixed and, though their obligation was not correlative, it was clearly contemplated by them and by McKell that they would do so. In so far as the lands were and continued thus leased, McKell's only remaining interest, in the lands or in the performance of the contract in suit, was that the coal should be mined rapidly, so that the payment of his royalties would be hastened and their present worth thereby appreciated. Accordingly, his damages, in whatever light the contract be viewed, could only be the diminution in the present value of his expectant royalties through their definite or indefinite postponement, in

so far as such postponement might be thought the reasonably probable result of the railroad company's refusal to carry out its contract with McKell to take all the coal on the leased premises, on the theory on which the case has so far been tried (or its contract with the lessees, inuring to McKell's benefit, to take the agreed 6,000,000 tons). The fact that the breach of this contract could at most only delay McKell's royalties, and did not destroy them, is emphasized by the evidence showing that up to the trial his representatives had received about $1,500,000 in royalties (computing royalties also on coal mined by the McKell interests).

It seems that the railroad company compromised and settled with each of the three lessees under its contract with each lessee to buy the amounts aggregating the 6,000,000 tons, and if the sale contract between the lessee and the railroad had been, with McKell's acquiescence pro tanto substituted for the railroad company's obligation to McKell, obviously the lessees could cancel the substituted obligation, and the injury to McKell would be too remote to give him damages against the railroad. If, however, the sale contracts for the 6,000,000 tons were only collateral, and an original or independent obligation to McKell still existed, it is equally clear that accord and satisfaction with the lessees would not affect McKell's right of action or damages. Written contracts purporting to show such compromise were offered, but excluded. Their admissibility depends upon the consideration just stated.

So much for the damages as to the leased lands. As to the remainder—the second class—damages would be of the same nature in so far as the lands might be developed through lessees; but at the time of the trial, the McKell interests were mining part of the lands themselves (or through an organization belonging wholly to them, for this purpose the same thing), and they might develop other parts of the land in the same way. As to the coal on such lands, McKell would lose the difference (reduced to terms of present worth) between the contract price of the coal and the market price at the time of mining and sale. Hence we are urged to say that the contract in suit has been put by plaintiff in the position of a contract for the sale of coal, and that, treating it as of that class, the measure of damages should be that ordinarily applied to contracts of sale, viz., the difference between the contract price and market price; and it is said that this measure has been held suitable in cases where it was no more impossible of application than here. That in this case the arrangement contemplated prices shifting over a long term of years; that the contract price was to be fixed by an inconstant comparative standard the variations in which human intelligence could not foresee; that at the time of the breach there could be no market value for this quantity of coal in this condition; and that the future market price was as likely to be more as to be less than the contract price—all these conditions make it difficult to apply the conventional rule or to apply any suitable special formula based on that rule. These difficulties become insuperable when we remember that the contract contemplated development through lessees. At the time of the breach this was apparently the only method which

had been in the mind of either party by which the coal was to be brought into deliverable condition; but if we assume that McKell had the right to mine his coal himself and require it to be taken, it must, at least, have been true that a great part of the coal would be mined by lessees. No one can say that it would have been all; no one can say it would have been less than all. As to this coal which was so to be mined by these supposed lessees, there is no room to consider as measuring McKell's damages the various questions of contrast between market price and contract price. These questions made no direct difference to McKell; he was to receive the same royalty, the same amount per acre, no matter what the market price. It is true that a rise in the market price, considered by itself, would tend to stimulate mining so that McKell would receive his royalties more rapidly, and be thus benefited, that a fall in market price, below Pocahontas (contract) price, would have made the contract more valuable, because it would then have been an inducement to take leases, and that the maintenance of market price above the Pocahontas figure would have the opposite tendency. These things, however, are too indirect and remote to enable us to use the difference between contract and market price as a measure. It must be understood that in this discussion of the measure of damages, so far as it pertains to lands not covered by the four leases, we are considering only the rules appropriate to the theory of fact upon which plaintiff stood, viz., that he had elected to sell all the coal at Pocahontas prices.

These considerations, among others, lead us to the conclusion that while the measure of damages adopted below cannot be supported by wholly satisfactory reasons, yet it is as to the unleased lands, the best and most appropriate measure of which the case permits; and it must be adopted at the peril of otherwise saying that the damages are too speculative to permit recovery.

This contract—even from the point of view compelled by plaintiff's theory that there was an election to sell all the coal—must be treated as in the nature of a development or operating facility, a quasi appurtenance to the land; and the jury must ascertain, if the proofs permit, the difference between the value of the 23,000-acre tract, or of the 8,500-acre tract, as it stood after the breach, with the then existing right to find another outlet and other purchasers, and the value which it would then have had if accompanied by the closed contract on the part of McKell to sell and deliver, and on the part of the railroad company to buy and take all the coal on the tract at Pocahontas prices. The question whether McKell could recover, in addition to or in place of this measure, the expense of procuring another outlet to market is not now before us, and we do not undertake to pass upon it, nor upon the form of the hypothetical value question used upon the last trial.

The judgment must be reversed with costs, and the record remanded for a new trial.

McCALL, District Judge, concurs in the general conclusion reached reversing the case and awarding a new trial.