### BURR et al. v. CITY OF COLUMBUS, OHIO, et al.

(District Court, S. D. Ohio, E. D. October 29, 1918.)

No. 106.

1. CARRIERS ☞12(9)—RATE OF FARE—CHARTER CONTRACT.

A franchise contract between a city and a street railroad company for a term of 25 years, fixing the rate of fare, is binding on both parties throughout the term, and cannot be terminated by the company on the ground that the continuance of normal labor conditions was an implied term, and that the abnormal increase in wages caused by the war and the action of the War Labor Board renders further performance at the fixed rate of fare impossible, because it would bankrupt the company. In such case, while such abnormal conditions were not contemplated by either party, the company might have guarded against them in the contract.

2. CARRIERS ☞12(9)—CHARGES—FRANCHISE—RELEASE FROM PERFORMANCE—ACTION BY WAR BOARD.

The fixing of wages to be paid by a street railroad company in arbitration by the War Labor Board, although at a rate which, under the charter contract between the company and the city, is confiscatory, is not such a direct interference with the contract by the government as to excuse the company from performance.

In Equity. Suit by I. Tucker Burr and others against the City of Columbus, Ohio, and others. On motion of complainants for preliminary injunction and by defendants to dismiss bill. Motion for injunction denied, and bill dismissed.

Affirmed 249 U. S. ——, 39 Sup. Ct. 354, 63 L. Ed. ——.

[Editor's Note.—With this opinion should be read Judge Westenhaver's opinion in Columbus Railway, Power & Light Co. v. City of Columbus, Ohio, et al. (D. C.) 253 Fed. 499.]

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

William O. Henderson, Henry J. Booth, Henderson & Burr, and Booth, Keating, Pomerene & Boulger, all of Columbus, Ohio (Joseph S. Clark and Henry A. McCarthy, both of Philadelphia, Pa., of counsel), for complainants.

Henry L. Scarlett, City Atty., of Columbus, Ohio (Pugh & Pugh, of Columbus, Ohio, of counsel), for defendants.

HOLLISTER, District Judge.   Heard on motion of complainants for a preliminary injunction restraining the defendants, pending the suit, from in any way forcing or compelling, or attempting to force or compel, the Columbus Railway, Power & Light Company, a corporation of Ohio, hereinafter called the company, to operate its lines of street railway in the city of Columbus under the certain ordinances set out in the bill, and on defendants' motion to dismiss the bill.

The complainants are owners of mortgage bonds of the series of first mortgage bonds executed by the company.   It is assumed for the purposes of this case that complainants have the capacity to bring the suit, and, being citizens of states other than Ohio, the court has jurisdiction to entertain it and make appropriate orders.

With the exception of parties plaintiff, this bill is in substance, and almost exactly in language, the same as the bill filed by the company in the suit instituted by it, in which Judge Westenhaver found, in an exhaustive opinion handed down September 20, 1918, that the court had no jurisdiction, in that no federal question was involved, and that the bill, on the facts alleged, was without merit.

The changes in the bill are designed to make a stronger case than the allegations in the bill in the suit brought by the company presented.   To the statement in that bill, "The further operation of said company's street railway property at said rates of fare would be not only impracticable, but impossible, both financially and otherwise," is added, "and would bankrupt said company within a short time." This bill includes also allegations, not found in that bill, showing that the franchise rate of fare is unfair, unreasonable, and confiscatory, and the injury that would result to complainant's security in the event of bankruptcy.   From the prayer is omitted the prayer in the company's bill that the city be enjoined from interfering with the possession or control of the street railway property.   Other minor changes need not be noticed.

With the exception of the question of complainants' capacity to sue, Judge Westenhaver's opinion in the company's case is applicable to every issue presented in this case.   Since I agree with his conclusions, it would be a useless task to again discuss all of the principles involved, or to set out at length the numerous authorities dealing with them.   I have considered all of them, and the elaborate briefs of counsel, worthy of so important a case, which, as one of counsel for complainants remarked at the opening of the argument, presents some novel considerations.

[1] Some observations appropriate to these may not, however, be amiss.   The novel feature of prime importance lies in the claim of

complainants that the doctrine of implied conditions in the law of contracts is applicable to the facts stated in the bill. The diligence of counsel has not discovered a case like it. The able opinion of Judge Killits in the Toledo Street Railway Case (D. C. August 2, 1918) 254 Fed. 597, of Judge Tuttle in the Detroit Street Railway Case (August 12, 1918),[1] of Judge Chatfield in the Brooklyn Case (D. C. September 9, 1918) 253 Fed. 453, and of Judge Allread in the Village of Fort Loramie Case (July 9, 1918), not as yet reported, are not applicable, for the reason that in all of these the street railway franchises had expired, or the road was in the hands of a receiver, or was operated by a third party, a purchaser at judicial sale. Here the primary question in the case is whether or not they have come to an end. If they have, then the consideration of these cases would be necessary, as well as the highly important Case of the Denver Waterworks, decided by the Supreme Court of the United States March 4, 1918. 246 U. S. 178, 38 Sup. Ct. 278, 62 L. Ed. 649.

If the conclusion is right that, under the authorities, the offer and acceptance of the franchises in question constitute a contract binding on both parties for the 25 years of their respective lives, then these cases have no application, unless the circumstances alleged are such as to bring into operation rules which excuse the performance of a contract solemnly entered into. If such circumstances exist, it might be said, as it is in this case, that, the franchises having come to an end by the nonfulfillment of conditions implied when the contracts were made, an attempt to enforce the contracts and require the carrying of passengers at the agreed upon rate is the same as if the council had passed an ordinance prescribing confiscatory rates.

Whether or not there may be a difference between agreed rates and prescribed rates accepted by the grantee in such franchises as these, and whatever views may be entertained by courts of last resort in some of the states on the propriety of the grantee's bringing a contract, binding on the grantor, to an end because the agreement only requires operation at prescribed rates while the franchises are being enjoyed, is not, in Ohio, important; for, under the decisions to which Judge Westenhaver called attention, and especially the decision of the Supreme Court of the United States in the Cleveland Street Railway Case, 194 U. S. 517, 536, 24 Sup. Ct. 756, 763 (48 L. Ed. 1102), in which Chief Justice White said, "We can see no escape from the conclusion that the ordinances were intended to be agreements binding upon both parties definitely fixing the rates of fare which might be thereafter charged," the question is no longer, in a District Court, open to debate.

At the conclusion of the arguments of counsel, the legal questions being presented at length and with much clearness, I had no doubt that the franchises were contracts for their full terms, but had some doubt of the correctness of the defendants' contention that the doctrine

---

[1] Judgment reversed by Supreme Court 248 U. S. 429, 39 Sup. Ct. 151, 63 L. Ed. ——.

of implied conditions was not applicable to the facts of this case, both as to complainants' claim that the pending world war and the consequential increased wage of labor to an extent that would bankrupt the company, unless it received higher rates than the contract rates, and as to the action of the War Labor Board in fixing wages in an amount so large as to bring about the same result, could not have been in contemplation of either party at the time the contracts were entered into, and that therefore the contracts were at an end.

That doubt lingers still. It must be conceded by defendants that, when the contracts were made, the parties could not have had in mind the possibility that years thereafter such a catastrophe as this war would have befallen the world, and that the extraordinary rise in the cost of living, resulting therefrom, would have required an advance in the cost of labor so great as, if operation under the franchises were continued at the contract rate, to bankrupt the company, or that what was in effect a governmental compulsory war board of arbitration would fix a confiscatory wage for labor.

If to the facts involved in this concession is applied what was said by Mr. Justice Jackson in Railway v. Hoyt. 149 U. S. 1, 15, 13 Sup. Ct. 779, 37 L. Ed. 627, and by Vaughan Williams, L. J., in Krell v. Henry [1903] L. R. 2 K. B. 740, it will be appreciated that much may be said in support of complainants' position. In the former case it was said (149 U. S. 15, 13 Sup. Ct. 784, 37 L. Ed. 627):

"But where the event is of such a character that it cannot be reasonably supposed to have been in the contemplation of the contracting parties when the contract was made, they will not be held bound by general words, which, though large enough to include, were not used with reference to, the possibility of the particular contingency which afterwards happens."

And in the latter (page 749):

"I do not think that the principle of the civil law as introduced into the English law is limited to cases in which the event causing the impossibility of performance is the destruction or nonexistence of something which is the subject-matter of the contract or of some condition or state of things expressly specified as a condition of it. I think that you first have to ascertain, not necessarily from the terms of the contract, but, if required, from necessary inferences, drawn from surrounding circumstances recognized by both contracting parties, what is the substance of the contract, and then to ask the question whether that substantial contract needs for its foundation the assumption of the existence of a particular state of things."

It is urged that when the contracts were made the city wished to get their benefits for 25 years, and the company expected to obtain the advantage of operation for 25 years. Thus the contracts were to be of mutual advantage for that length of time. It is argued that both parties knew, agreeing on the terms accordingly, that bankruptcy would make impossible the fulfillment of the contracts, and that its consequence would be disastrous to both parties; that they knew that wages were the greatest single item in the cost of operation; that they had in mind only such increases or decreases as might be expected in normal times; that if the rate of fare per passenger were low, such increases of labor as normal conditions might bring about

would be compensated by the increased number of fares in a growing city, such as was Columbus at the time the contract was entered into, and is now; and that the wages of labor in normal times was a condition implied from a consideration of the parties, the entire contract, its peculiar character, and from all the circumstances.

This argument carries counsel further than the circumstances of this case require, and, if sound, would lead to the conclusion that any abnormal labor conditions of such a character as to bring about the bankruptcy of the contractor by rendering compliance impossible would excuse him from performance and bring his contract to an end. This cannot be. A frequent illustration of abnormality in labor conditions is strikes, and their often disastrous financial consequences to the employer of labor. No one would now say that strikes and their results, however serious the financial consequences, bring to an end the contractor's obligation to perform his contract requiring the employment of labor. For still less cause could one affirm that if, upon adjustment of the controversy, the contractor agrees on a wage so high that it would bankrupt him within a short time, he could terminate his contract.

The case finds no analogy in those cases in which it is held that a contract for personal service comes to an end on the death of him who has contracted to perform it, or in those cases in which a fact must have been in the minds of the parties without which the express contract, silent on the subject, would not have been entered into, such as C. & O. R. Co. v. McKell, 209 Fed. 514, 522, 126 C. C. A. 336 (C. C. A. 6), and Wheeling & L. E. R. Co. v. Carpenter, 218 Fed. 273, 285, 134 C. C. A. 69 (C. C. A. 6), in which express contracts by a railroad company with the proprietor of a coal mine on its road to take for itself for fuel purposes, or to haul away, a stipulated amount of coal, were held to embody implied agreements that the railroad company would supply sufficient cars to haul the stipulated amount of coal away, or in such cases as Krell v. Henry, [1903] 2 K. B. 740, in which the conclusion was that, inasmuch as the letting of the windows was, as well understood by both parties, to permit the user to see King Edward's coronation procession. the indefinite postponement of that ceremony, because of the illness of the King, brought the contract to an end, or in the Seamen's Case (Liston v. Steamship Carpathian, [1915] L. R. 2 K. B. 42), in which it was held that the seamen's contract for the entire voyage was, at their election, brought to an end before completion by the danger of capture by enemy ships, the threat of which was learned by the seamen at a port at which the ship touched during progress of the voyage, and from which the sailors refused to proceed except at an increased wage.

If there is any analogy presented by the Seamen's Case, it lies in the fact that in that case the danger of capture during the voyage was not in the minds of the shipowner or the seamen when the shipping articles were agreed to, while in this case the certainty of bankruptcy, growing out of conditions affecting wages brought about by the same war, could not have been contemplated by either party.

Logically, if the Seamen's Case, is applicable to this, and should be adopted as the law of such a case as this (it was decided in February, 1915), the way would be open for the destruction of innumerable contracts, to carry out which the employment of labor is necessary, and which the parties expected, and agreed, to carry out, whatever the condition of the labor market might be during performance. In my judgment, the Seamen's Case does not apply to this, nor do I think what was said by Mr. Justice Jackson and Vaughan Williams, L. J., hereinbefore quoted, do apply or were intended to apply to any possible case which might arise. In those cases the parties did not have in mind, and there was no reason why they should, that in one the particular circumstances over which they had no control might prevent the storing of the grain the railroad company agreed to deliver and was ready and willing to deliver, and in the other that the procession, to see which was the object of the contract, might not take place.

But the circumstances here present a different case. In the preparation for the bidding there were a number of prime factors the company had in mind in determining the rate at which it was willing to carry each passenger. That was based on a number of considerations: The then population of Columbus; the rate of increase in the city's population, as shown by the census, and perhaps by interim statistics; the cost of operation, including salaries, supplies, and especially wages. The great item of cost each year would be wages, seldom subject to diminution, and having in it even at that time potentialities of tremendous increase. What labor in this country would be demanding during 25 years was one of the most important questions to be debated by the promoters of complainants' predecessors.

On the figure to be paid in wages each year depended the great question of dividends, without at least the hope of which the franchises would not have been sought. Unexpected conditions in the labor market, growing out of a war of such character as to have been beyond the anticipation of any one, have thrown the carefully considered plan, which involved revenues greater than cost, out of adjustment, have reversed the contemplated ratio of revenues to cost, and have defeated the plan.

While the parties did not anticipate the happening of this war, yet the contractor might well have anticipated such rising wages, possible during 25 years, from whatsoever cause, as might wreck the plan and precipitate bankruptcy. As in the law he would be required to guard himself against the consequences of nonfulfillment by reason of strikes, so here the contractor could have guarded itself against an increase in the cost of labor so great as to prevent its doing what it agreed to do. Contracts for future performance often contain a clause excusing the contractor from performance made impossible by future happenings over which he has no control.

Of course, the grantee here intended, expected, and contracted to operate under the franchises for 25 years at the contract rate. Since to do this it was necessary that wages should be always at a figure which made performance possible, it was necessary, in my judgment,

for the grantee of these franchises to have guarded against a situation which might happen, namely, the failure of revenue to meet expenses through circumstances unanticipated and over which the grantee had no control.

This brings into application what was also said by Mr. Justice Jackson in Railway v. Hoyt, 149 U. S. 1, 14, 15, 13 Sup. Ct. 779, 784 (37 L. Ed. 627):

"There can be no question that a party may by an absolute contract bind himself or itself to perform things which subsequently become impossible, or pay damages for the nonperformance, and such construction is to be put upon an unqualified undertaking, where the event which causes the impossibility might have been anticipated and guarded against in the contract, or where the impossibility arises from the act or default of the promisor."

If this conclusion is sound, and I think it presents the better argument in the debate, then the doubt must be, and it is, so far as this court is concerned, resolved in favor of the defendants.

[2] But, it is said, these wages were fixed at a confiscatory rate by the War Labor Board, and thereby the case is brought within the principle of Metropolitan Water Board v. Dick, Appeal Cases [1917] H. of L. 119, 2 K. B. 1, and of Judge Ray's decision in the Knitting Company Case (D. C.) 250 Fed. 278, in each of which a contractor was excused from performance. In one, the English government commandeered the plant of a contractor to build waterworks, making it impossible for him to proceed with his contract. In the other, the Knitting Company's mill was, in effect, commandeered by the United States government, rendering the performance of its contracts with others impossible.

This is a different case. Here the government did not interfere directly with the contract, or appropriate in any way the complainants' plant to any of the government's purposes. The 'vis major apparent in those cases is wholly lacking here. It is true that the requirement to submit to the arbitration of the War Labor Board was, in effect, compulsory, and its award binding; but it was not the award which brought about the condition which threatens the company with bankruptcy. It was the condition which made the award necessary which brought about the result. Presumably the award was just. Any proper adjustment between the company and its employés would necessarily have been substantially, so far as results are concerned, the same sum as the award.

From what has been said, the conclusion must be that these franchises constitute valid contracts for 25 years from their date, binding on both parties, that the doctrine of implied conditions is not applicable to the circumstances of the case, that no federal question is involved, and that the bill is without merit.

It is urged that, since the court has acquired jurisdiction through the diverse citizenship of the parties, a preliminary restraining order may issue, in view of the great existing public emergency growing out of the controversy between the city and the company. Whatever might be the power of the court in an action by the city against the com-

pany for specific performance to hold the situation in statu quo until the legal rights of the parties are determined, it is not called into exercise here, for reasons dealt with by Judge Westenhaver, and for the reason that the court should not issue a preliminary restraining order in a case in which the court, on hearing the motion to dismiss, is of opinion that the complainant has no cause of action.

The bill will be dismissed at complainants' costs. · Necessarily, the motion for a preliminary injunction is denied.

We have been discussing legal rights cognizable by a court of equity. The allegations in the bill, however, present other aspects and involve considerations of the highest moment to the people of Columbus, to the public comfort, convenience, and peace, as well as to the large interests of complainants now jeopardized by a situation unforeseen by it and the city when the franchises were granted, and which, unhappily, the company's predecessors did not safeguard, although they should have done so. "The present emergency," Judge Westenhaver said in the company's case, "calls urgently for some kind of accommodation or temporary compromise between the parties." In that, and all that he says in that behalf, I agree, and may be permitted to express the hope that the city's representatives will meet with the representatives of the company in a spirit of accommodation and compromise, and that the representatives of the company will meet with them and frankly disclose such facts as the city's representatives should know when the question of what would be a reasonable rate, under the present conditions, is discussed and agreed upon.