WHEELING & L. E. R. CO. et al. v. CARPENTER et al.

(Circuit Court of Appeals, Sixth Circuit.   November 6, 1914.)

No. 2426.

1. CARRIERS (§ 66*)—MEANS OF TRANSPORTATION—IMPLIED CONTRACTS—RE-
ORGANIZATION OF CORPORATION.

A railroad company, owning the controlling interest in a coal company,
which was insolvent and in the hands of a receiver, devised and proposed
and carried out a plan of reorganization, which involved (1) the ac-
quiring of the property by a committee of bondholders through foreclo-
sure sale, and its transfer to a new company organized by the railroad
company; (2) the issuance by the new company of obligations to be paid
within 10 years to take up receiver's certificates and other indebtedness
prior in lien to the bonds, and also bonds to the old bondholders to the
amount of 75 per cent. of their former holdings; (3) a lease of the prop-
erty for 10 years providing that the lessee should mine not less than
700,000 tons of coal per year and pay a fixed royalty thereon; (4) a con-
tract between the railroad company and the coal company, by which the
former agreed to pay to the coal company a stated sum per ton on all
coal shipped by the latter, to be applied to the payment of the prior lien
obligations until both interest and principal should be discharged, in
consideration of which it was to have all of the stock of the coal com-
pany.   The mortgage securing such obligations and the bonds provided
that the royalties under the lease should be applied to the payment of
interest on the bonds and in creating a sinking fund for payment of the
principal, any surplus to be applied to the prior lien obligations.   Under
such several contracts, if the minimum quantity of coal only was mined,
the coal company would have sufficient income to meet all such require-
ments, with a small surplus.   During the first two years the lessee mined
more than the required minimum, but thereafter much less, because of the
failure and refusal of the railroad company to furnish sufficient cars, there
being no other means of shipment.   The lessee was able and desired to
mine the minimum or more each year, and obtained and furnished to
the company additional cars, which it diverted to other uses.   The coal
company had no independent existence; its officers and directors being
officers and employés of the railroad company, which controlled all of its
actions.   *Held,* that as the reorganization plan was that of the railroad
company, in reliance on which the lease had been made and the bond-
holders had scaled their holdings, its contribution agreement, by which
the prior lien obligations were to be paid, was based on a valuable con-
sideration and valid; that as the success of the plan and the solvency of
the coal company depended entirely on the production of at least the
minimum quantity of coal named, as was understood by all of the parties,
which again depended upon the car supply, there was an implied contract
on the part of the railroad company to furnish the cars required, on which
the bondholders had a right to rely, and that the railroad company was
liable for all loss sustained by them by reason of its failure to do so.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. § 221; Dec. Dig.
§ 66.*]

2. CONTRACTS (§ 168*)—CONSTRUCTION AND OPERATION—IMPLIED CONDITIONS.

The circumstances surrounding an express contract and what is to be
performed under it may raise implied incidental agreements not directly
involving the subject-matter expressly agreed upon.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. § 751; Dec. Dig.
§ 168.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes
218 F.—18

Appeal from the District Court of the United States for the Eastern Division of the Northern District of Ohio; William L. Day, Judge.

Suit in equity by E. E. Carpenter, Franklin Leonard, Jr., and Joseph T. McCaddon against the Wheeling & Lake Erie Railroad Company, W. M. Duncan, its receiver, and others. Decree for complainants, and defendant Railroad Company and its receiver appeal. Modified.

The Wheeling & Lake Erie Railway Company, a corporation of Ohio, owning a large part of the stock of the Wheeling, Lake Erie & Pittsburgh Coal Company, a corporation of Ohio, controlled it as a subsidiary company, and through it had carried on the business of mining coal. Both were in the hands of the same receivers. The railway company was reorganized in 1900, under the name of the Wheeling & Lake Erie Railroad Company, a corporation of Ohio. The lands of the coal company, containing coal mines, were adjacent to the railroad, which furnished the coal's only outlet. The receivers operated the coal mines. M. A. Hanna & Co. were sales agents for the receivers, and continued as such until January, 1902. There were outstanding against the coal lands a mortgage made by the coal company securing something less than $1,000,000 of bonds, and receivers' certificates and other debts prior to the bonds, the exact amount of which does not clearly appear.

January 25, 1897, an agreement providing for a complete plan of reorganization of the coal company was made between a committee of the bondholders, the Mercantile Trust Company and such bondholders as might deposit their bonds with the trust company for the purpose. April 11, 1900, the bondholders' committee submitted to the bondholders a plan of reorganization, and with it a circular of date April 19, 1900, prepared after consultation with representatives of bondholders and "various interests concerned." These interests were M. A. Hanna & Co., who were selling the coal mined by the receivers, and the railroad company, which controlled the mines and transported the coal.

The committee advised the bondholders of their belief that they had devised a method by which the necessary moneys could be raised and the future of the company made secure, which should be satisfactory to all the bondholders. The information in the circular to that end was:

"1. The moneys necessary to pay receivers' obligations and expenses for foreclosure and reorganization are provided for in this plan by the issue of temporary prior lien obligations, the payment of which is to be in large part made and in effect is to be guaranteed by the Wheeling & Lake Erie Railroad Company.

"2. The committee have now practical assurance that the moneys required to pay interest on the new issue of bonds, together with sinking fund, taxes, etc., can be raised by means of a lease of the mines to responsible parties, on a royalty of 6½ cents per ton on the amount of coal mined, with a guaranty of a minimum output of seven hundred thousand tons each year."

It was further said in the circular:

"In consideration of the large contribution to be made by the railroad company to the amount necessary to pay the receivers' obligations and the expenses of foreclosure and reorganization, the total of which it is estimated will be from $175,000 to $180,000, the capital stock of the new company, except so much of it as the committee in its discretion shall see fit to use in discharging the floating debt of the coal company, is to be turned over to the railroad company.

| | | |
|---|---|---|
| The expected minimum income of the new company under the proposed lease is.............. | | $45,500 00 |
| The interest on the proposed new bonds, $634,500, at 4 per cent................................ | $25,380 00 | |
| The amount for sinking fund.................... | 10,000 00 | |
| Estimated amount for taxes, etc................ | 7,000 00 | 42,380 00 |
| Surplus ........................................... | | $ 3,120 00 |

"It is expected that this surplus, together with the contributions from the railroad company, will care for the interest on the prior lien obligations, and in a few years discharge them entirely, leaving the new bonds an absolute first lien upon the property. It is also expected that the output of the mines will be considerable in excess of the minimum to be stipulated for in the lease, in which case the payment of prior lien obligations will be proportionately hastened. * * * In order to bring the interest charges of the new company within the income which is expected to be assured under this plan, it has been necessary to give to the bondholders 75 per cent. only of the face of their present holdings; but inasmuch as the new bonds will have the prospect of a regular income, as well as the advantage of a sinking fund, it is believed that the result to the bondholders will be better than that attainable by any other method which the committee can devise."

The plan, of great length and amplification of detail, was, in substance, that the foreclosure of the mortgage be brought about; the property bought in for the bondholders and paid for by the bonds pro tanto; a new corporation organized under the name of the Pittsburgh, Wheeling & Lake Erie Coal Company to take over the property; the issue of prior lien obligations at 5 per cent., maturing in 10 years, due July 1, 1911, not to exceed $200,000, to discharge obligations prior to the bonds, and $634,000 in mortgage bonds at 4 per cent. payable semiannually, due in 30 years from date, subject to the prior lien obligations, and $1,250,000 in stock. The provisions for the payment of prior lien obligations were:

"1. By applying thereto the surplus earnings of the new company, after paying or setting aside the sums required for the payment of the semiannual interest upon the said mortgage bonds and for maintaining the yearly sinking fund. * * *

"2. By the contribution by the Wheeling & Lake Erie Railroad Company to the said new company towards the payment and discharge of said prior lien obligations of a sum equal to one cent upon each ton of coal produced by the mines of the new company and transported upon or over the road of said railroad company for the first year after the date of said prior lien obligations; the contribution by said railroad company for the next succeeding year, for the same purpose, of a sum equal to two cents upon each ton of coal so produced and transported; and by the contribution by said railroad company for each year thereafter, for the same purpose, of a sum equal to three cents per ton upon each ton of coal so transported, until the entire principal and interest of such prior lien obligations have been paid and discharged—it being understood that said railroad company shall not be required to make any contribution upon the coal produced by said new company and purchased from it by the railroad company for the latter's own use and consumption. * * * The contributions of said railroad company to said new company towards the payment and discharge of said prior lien obligations as aforesaid are to be provided for and made effective by such agreements with or guaranties executed by the said railroad company as the committee and their counsel shall determine."

Provision was made for securing the prior lien obligations and bonds by mortgage; the right of enforcing the security to be given to the holders of either class of obligations; the mortgage to provide also for the establishment of a sinking fund from the earnings of the new company of $10,000 annually, which was to be used in the purchase of additional coal lands, or in the purchase and retirement of the bonds on allotment. The committee in their discretion were to use the preferred stock in settling prior claims, and any of such stock not so used and all the common stock were to be delivered to the railroad company in consideration of the contribution agreement "based upon the amount of coal produced by the new company and transported by the said railroad company upon or over its railroad."

The minutes of the reorganization committee of a meeting at New York August 16, 1901, show that all the outstanding bonds had been deposited with the committee, except 2; that the mortgage upon the property of the Wheeling, Lake Erie & Pittsburgh Coal Company had been foreclosed, and the same had been purchased on behalf of the committee for the upset price of $350,000

and the assumption of the receivers' liabilities; that a new company had been formed in Ohio, to be called the Pittsburgh, Wheeling & Lake Erie Coal Company, and that the papers had all been prepared for the transfer of the property so purchased on behalf of the committee to the new coal company; that a mortgage by the new company to the Mercantile Trust Company, to secure the bonds and prior lien obligations, was to be made under the plan of re-organization; that a lease of the mine had been agreed upon to the Wheeling & Lake Erie Coal Mining Company, guaranteed by M. A. Hanna & Co., on a royalty of 6½ cents a ton, the lessee agreeing to pay on not less than 700,000 tons each year; that an agreement had also been entered into between the new company and the Wheeling & Lake Erie Railroad Company for a contri-bution to be made by the latter upon each ton of coal transported by the rail-road, in accordance with the terms of the plan; that these papers had not yet been delivered, awaiting the completion of another agreement between the railroad company and the Wheeling & Lake Erie Coal Mining Company, which latter agreement was expected to be consummated the present week. (This agreement was for fuel coal.)

Thereupon it was resolved, among other things, in substance, that the chair-man cause to have completed and delivered the necessary papers to carry out the transfer of the property to the Pittsburgh, Wheeling & Lake Erie Coal Company, theretofore formed, and to receive from it the prior lien obliga-tions, bonds, and stock pursuant to the plan. And from the minutes it ap-pears further:

"During the consideration of the foregoing resolution the following tele-gram was received, and ordered to be placed on file:

"Cleveland, Ohio, Aug. 15, 1901.

"A. W. Krech, Mercantile Trust Co., New York: Have just had conference, at which were present Herrick, Squires, Hanna, Blickensderfer, and myself, and we have arranged fuel matter satisfactorily. Hanna says that lease will be executed this afternoon, so the reorganization committee can go ahead.

"J. Ramsey, Jr."

Ramsey was the president of the railroad company. Krech was an officer of the Mercantile Trust Company and secretary of the committee, and an of-ficer of the railroad company. In June the railroad company, through its agents and employés, had organized the Pittsburgh, Wheeling & Lake Erie Coal Company, with a capital stock of $1,250,000, to take over the property of the old coal company. No money was paid in, except $12,500—doubtless used for expenses. And the Wheeling & Lake Erie Coal Mining Company was created by M. A. Hanna & Co. to mine the coal.

At a meeting of the directors of the new coal company, who were also its incorporators and employés of the railroad company an offer was made by one of them proposing to cause to be conveyed to the new coal company the old company's property recently sold on foreclosure, and to procure acceptance by the coal mining company of a lease of the property from the new coal com-pany for the term of 10 years from July 1, 1901, on a royalty of 6½ cents per ton mined and removed from the property, a minimum of 700,000 tons per annum to be mined. He also proposed to procure a contract for the new coal company with the railroad company whereby the railroad company would contribute toward the payment of the prior lien obligations (setting forth the manner of contribution described in the plan), for all of which he, or his nominee, was to receive all of the capital stock, $200,000 in prior lien obli-gations, and mortgage bonds hereinbefore described.

The proposition provided for a mortgage from the new coal company to the Mercantile Trust Company to secure the prior lien obligations and the bonds, and the use by the coal company of the prior lien obligations and the bonds for the purpose of carrying out the reorganization, and on acceptance a deed was to be given the new coal company. The proposition was accepted, and the railroad company entered into an agreement July 1, 1901, with the coal company and the Mercantile Trust Company, as trustee (after reciting, among other things, that "said plan of reorganization was adopted and all proceed-ings thereunder had upon the assurance duly given by the railroad company

that it would execute and deliver an agreement to the tenor and effect hereof"), to pay to the trustee the contributions upon the amount of coal mined by Hanna & Co.'s mining company and transported by the railroad (as set forth in the plan), and that its contributions should be used by the trustee in payment of principal and interest of the prior lien obligations, and that "when the same shall have been paid and discharged in full the obligations of the railroad company to make the payment aforesaid upon each ton of coal produced and transported as aforesaid shall cease and determine." The coal company on its part agreed, until those obligations should be fully paid, to pay each year to the trustee all the surplus earnings of the coal company in accordance with article IV of the mortgage to the trustee, to which further reference will be made.

July 1, 1901, the railroad's new coal company and Hanna & Co.'s mining company entered into an agreement of lease, the terms of which were guaranteed by Hanna & Co., by which the mining company agreed to mine and remove from the coal lands at least 700,000 tons annually, and to pay for each ton so mined and removed the sum of 6½ cents as royalty to the coal company, and, if the coal were not mined, to pay royalty at the same rate, and agreed to pay all the taxes on personalty and to do many other things. The railroad company admits that it was the "real lessor" in this lease.

The mortgage securing the prior lien obligations and the bonds is of great length. It recites that its purpose is to secure the payment of the principal and interest of the prior lien obligations as a paramount lien and the principal and interest of the mortgage bonds; and for the further security for the payment of the prior lien obligations, the mortgagor agreed (article IV) to pay annually to the trustee all of its surplus earnings, and (article VI) to establish a sinking fund of $10,000 annually to be applied to the payment of mortgage bonds on allotment as far as the money would go. And the mortgage further provided (articles VII and X) that until default be made the coal company (the mortgagor), its successors or assigns, "shall be permitted to remain in the actual possession and enjoyment of all and singular the property herein conveyed, or intended so to be, and of the revenues and income thereof, using the same, developing and operating the mines contained and to be contained within the lands and premises hereinbefore described, removing the coal therefrom, and selling and disposing thereof in the same manner as though this indenture was not made," and that in case of default the mortgagee was given the right of entry and to operate the mines and conduct the business, etc., and "also to collect and receive all the revenues, income, increase, rents, issues, and profits of the same.  *  *  * "

One other written agreement completes the list. In the railroad's agreement to contribute, it was provided that there should be no contribution for coal used and consumed by it. Inasmuch as the railroad's coal company was a company on paper and the mines were to be operated by the mining company, an agreement was entered into between the railroad company and Hanna's mining company, by which the railroad could get coal for its own use and consumption. This was made August 15, 1901, the same day the telegram was sent by Ramsey to Krech, and in it the railroad company (after reciting that Hanna & Co. were the sales agents of the mining company and that the railroad company was interested in the property and desirous of having it worked to its capacity, and of obtaining all coal mined therefrom for transportation over its road, except so much as it desired to use for its own fuel), agreed that the mining company would, for five years, sell, and the railroad company would buy, certain coal for fuel to be delivered at the mines of the mining company, and provision was made for renewal for an additional five years, "conditioned that the Wheeling & Lake Erie Coal Mining Company, its successors and assigns, shall mine at least the minimum tonnage of 700,000 tons per year provided for in its lease from the Pittsburgh, Wheeling & Lake Erie Coal Company, and shall ship over the railroad of second party all of the coal so mined not taken under this contract by the railroad company."

The adoption of the plan was awaiting the execution of this fuel agreement and the Hanna mining company lease. Not till then was the reorganization

permitted to "go ahead." The plan proceeded. All of the stock, both preferred and common, was issued to the railroad company, and the prior lien obligations (owned by Hanna & Co. when this suit was brought) and bonds were issued. It was proved that the mining company could have produced, and Hanna & Co. could have sold, more than the minimum during the entire life of the prior lien obligations, if the railroad company had furnished the cars for transporting the coal. The railroad company, the coal company, and Worthington, receiver of both, admit in their separate answers that "the failure to mine and ship the minimum quantity of coal specified in said lease (Hanna mining company lease), and to pay the royalties thereon, was occasioned by the failure and refusal of the Wheeling & Lake Erie Railroad Company, the real lessor of said premises, to furnish sufficient facilities for handling and transporting the coal mined under said lease."

During the first two years of the working of the plan (1902 and 1903), the mining company mined more than the minimum; in 1904 much less, because of a shortage of cars, a situation which continued until the plan broke down. The success of the plan depended necessarily upon the railroad's furnishing cars to haul away the coal mined by the mining company. Its failure to provide the cars caused the failure of the plan of reorganization which it promoted for its own benefit and permitted the bondholders to participate in only upon surrendering 25 per cent. of their just debt against its coal company. Hanna & Co. repeatedly called the railroad's attention to the car shortage. They even went so far as to provide with another mining company 1,500 cars for the use of the railroad in transporting the coal. These and much of the equipment of the railroad company were diverted by it to other purposes.

In the meantime the plan of reorganization of the coal company, by which the bondholders, through the railroad's contribution agreement and Hanna's coal company's royalties, were to get their interest paid and some at least of the principal, and the holders of the prior lien obligations were to get their interest and principal within 10 years, was being starved to death. The repeated demands of Hanna & Co. for cars to be supplied the mines of their coal company meeting with no response, they from time to time withheld royalties they had agreed to pay the coal company until they owed it up to December 31, 1907, $63,383.16, which they declined to pay. That they were injured greatly cannot be doubted. Thereupon they dealt directly with the railroad company as the only party in interest for a modification of the lease, and both parties agreed June 2, 1908 (the mining company by D. R. Hanna, its president, the members of the firm of Hanna & Co., and the coal company by B. A. Worthington, its president, who was also the vice president and general manager of the railroad company, the coal company ratifying by direction of the railroad company), that the minimum tonnage should be reduced to 550,000 tons "as conforming to the conditions of car supply and facilities offered by the Wheeling & Lake Erie Railroad Company," and that the lease should be assigned to Hanna, Ireland, and Andrews, constituting the firm of M. A. Hanna & Co., who assumed the terms and conditions thereof. The mining company and Hanna & Co. were released from liability for claims for royalty growing out of the failure to mine the minimum 700,000 tons annually up to December 31, 1907, and Hanna, Ireland, and Andrews were given permission to transfer the leases and agreement to a corporation to be organized by them or to the Wheeling & Lake Erie Coal Mining Company, but were not released from the original guarantee of their firm on the lease.

It was shown that in the negotiations leading up to the making of the original lease, the negotiations being had with officers of the railroad company, Hanna was assured that there would be transportation sufficient to move the coal contemplated by the plan, and he testified this was the condition upon which the agreement with his mining company was made. But even at the reduction to a minimum of 550,000 tons, the railroad company continued to default in furnishing cars and the inevitable arrived. The railroad company having gone into the hands of a receiver June 9, 1908 (seven days after the modification of the lease was made), by appointment of the United States District Court for the Northern District of Ohio, Eastern Division, B. A. Worthington, its receiver and vice president and general manager, and presi-

dent of the coal company, representing to the court, December 20, 1908, that the coal company was subsidiary to the railroad company and was insolvent, brought about the appointment of himself as receiver of the coal company. Prior thereto, October, 1908, he, as receiver of the railroad company, represented to the court that it was not to the interests of the railroad company to continue the contribution contract, and obtained an order to discontinue payments. This order was without notice to the Mercantile Trust Company and at the time of the modification of the lease no notice was given to the bondholders or their trustee, but the negotiations to that end were conducted entirely between Hanna & Co. and the railroad company.

Interest, payable July 1, 1908, was paid on the prior lien obligations and upon the mortgage bonds, and during July, 1909, interest accruing January 1, 1909, upon the prior lien obligations was paid under the directions of the court. Those obligations being unpaid and the coal company being in the hands of a receiver, the complainants, Carpenter, Leonard, and McCaddon, on October 5, 1909, brought this suit against the railroad company, Worthington, its receiver, the coal company, and Worthington, its receiver, the coal mining company, Mercantile Trust Company, and Hanna, Ireland, and Andrews, doing business under the name of M. A. Hanna & Co. Duncan, receiver, is the successor of Worthington, resigned. The complainants are a committee of bondholders of the coal company, who, upon the refusal of their trustee to bring the suit, institute it for themselves and others who might come in. The bill, amended and supplemental, and the answers of the defendants, are of great length. In view of what has been said heretofore, and the assignments of error, it will be sufficient to refer only to the issues presenting any real controversy.

An issue was made on complainants' contention that the order instructing the receiver to discontinue making payments under the railroad company's contribution contract should be set aside; that the contract of modification of the lease be set aside as being a fraud upon the rights of bondholders; that Hanna & Co., who had become the owners of the prior lien obligations, should be enjoined from foreclosing the mortgage upon the coal company; that Hanna & Co. should be compelled to pay the full amount of royalties, and that the railroad company should account for all moneys which it was alleged had been by it diverted from the coal company by the wrongful payment of taxes and improvements upon the leased property, which the mining company had agreed to pay; that the Mercantile Trust Company should account for moneys in its hands applicable to the payment of interest on bonds and prior lien obligations; and that an accounting should be had of the liability of the mining company for amounts of royalties due by it.

The District Judge held that the contribution contract of the railroad company was based upon sufficient consideration and obligated it to pay for and retire, before their maturity, the prior lien obligations; that the bondholders relied upon that agreement of the railroad company, and in reliance thereon received their bonds, and that the failure of the railroad to pay off and retire the prior lien obligations, and prevent the foreclosure of the mortgage by reason of their maturity, would be a fraud on the bondholders; that the contract of modification of the lease by which Hanna & Co. were excused from the payment of the royalties in default was a valid contract, and released the mining company and Hanna & Co., as guarantors of the original lease, from all liability theretofore accruing thereunder; and ordered that pending the payment of the prior lien obligations by Worthington, receiver of the railroad company, Hanna & Co., and all parties acting under them be restrained from proceeding to foreclose upon the coal company until further order, and that the claim of the bondholders for moneys alleged to have been diverted by the railroad company for the payment of taxes and improvements on the coal property be transferred to cause No. 7603, pending in the District Court. A severance having been had, the railroad company and Duncan, as its receiver, alone appeal.

The railroad company and Duncan, its receiver, assign error in the decree below in finding that the bondholders of the old coal company were induced to accept the bonds of the new coal company upon the express promise of the

railroad company contained in its contribution contract; in finding that the contribution contract was a valid and legal contract based upon sufficient consideration, and obligated the railroad company to pay off before maturity the prior lien obligations; in finding that the bondholders relied upon the railroad company's agreement to retire the prior lien obligations before maturity and in reliance thereon received their bonds; in finding that the failure of the railroad to pay the prior lien obligations and prevent the foreclosure of the mortgage because of their maturity would be a fraud on the bondholders of the coal company; in ordering that the former order directing the discontinuance of payments under the contribution contract should be set aside; in not finding that the railroad company paid under its contribution contract $54,578.73, and its receiver had advanced $45,519.71 as interest on the coal company's funded debt, and that the railroad company should receive credit thereon for any sums due under the contribution contract.

J. G. Fogg and R. M. Calfee, both of Cleveland, Ohio, for appellants.

D. A. Holmes, of New York City, and F. H. Ginn, of Cleveland, Ohio, for appellees.

Before WARRINGTON and KNAPPEN, Circuit Judges, and HOLLISTER, District Judge.

HOLLISTER, District Judge (after stating the facts as above). [1] The plan of reorganization of the coal company was in fact the plan of the railroad company. By its agents and employés it brought about the incorporation of the new coal company to take over the assets of the old coal company, which it controlled. It engineered the various steps through which the prior lien obligations were exchanged for the obligations of the old coal company prior to its bonded indebtedness, and the new bonds were issued in exchange for the old bonds at a reduction of 25 per cent. of their face value, and the stock of the new company was issued to itself. In this way, by agreement with the bondholders, becoming the owner of all of the capital stock of the new coal company, its control over that company was absolute. It brought about the Hanna mining company contract with the coal company for royalties. Its own clerks kept the books of the coal company without additional compensation. It itself made with the Hanna mining company the contract modifying the mining company lease, which it caused its coal company to thereafter ratify. The various agreements to which the new coal company was a party were its agreements—the coal company solemnly going through the forms of corporate sanction. It dominated the bondholders' committee, the secretary of which was one of its officers. It was admittedly the "real lessor" in the Hanna mining company lease. The only function left to the bondholders' committee, as such, was to issue the prior lien obligations and the new bonds to those entitled thereto. Even these, dated July 1, 1901, could not be delivered until the railroad company had brought about that lease and the contract for coal for its own consumption.

When the lease, dated July 1, 1901, was consummated, the railroad company, on the date of its actual execution, August 15, 1901, directed the bondholders' committee to "go ahead." The lease was the foundation of the plan, for the railroad company, neither by itself nor through its coal company, mined, intended to mine, or could mine any

coal. The mining company guaranteed by Hanna & Co., was to mine the coal, and the royalty paid by it was the only revenue the coal company had from which, together with the railroad company's contributions payable to the trustee of the bondholders on the coal actually transported, the prior lien obligations, within the 10 years of their life, and interest, and interest on the bonds, and taxes on the real estate for 10 years, could be paid. So the only income contemplated by the plan and available for its purposes came directly or indirectly from the coal mined by the mining company. This revenue, within the 10 years, must be $200,000 for the prior lien obligations, $100,000 as interest at 5 per cent., $253,800 as interest on $634,500 of bonds, and $70,000 for realty taxes, estimated in the plan at $7,000 a year—a total of $623,800. In these figures is found the reason why the railroad company required the Hanna mining company to agree on a minimum production of 700,000 tons a year. The royalties on that minimum would amount, in 10 years, to $455,000, and the railroad company's contributions (leaving out of consideration, for the moment, the railroad company's agreement with the mining company for coal for its own consumption, which, as it was not transported, was not subject to the agreed contribution per ton), $189,000, a total of $644,000, in which there is a margin of $20,200 over the $623,800, the bare necessities of the plan required.

It was expected by all concerned that more than the minimum would be mined, and that the royalties and contributions would not only provide for the requirements of the plan, but would produce a sum in addition sufficiently large to accelerate the time of payment of the prior lien obligations and apply also to the payment of some of the bonds on allotment. The mining company was willing to mine, and could have mined, more than the minimum the railroad company required it to agree to mine, and Hanna & Co. were willing to sell, and could have sold more than the minimum, had not the railroad company refused and failed to transport the coal. It is clear enough that, if only the minimum were mined, the railroad company could not, consistently with the requirements of the plan, purchase from the mining company more coal during the 10 years than is represented by $20,200 at the percentage, under its contribution contract, of one cent and two cents, respectively, for the first two years, and three cents per ton for the succeeding eight years, for every ton it bought of the mining company for its own consumption reduced its contribution to the plan; the more it bought, the less its contributions would be, and vice versa. It is equally clear the mining company could not mine even the minimum, or any amount of coal, unless the railroad company furnished cars sufficient to carry it away. The success of the plan, therefore, lay wholly within the power of the railroad company. It could destroy the plan by denying to Hanna & Co. cars sufficient to haul the coal away, or by purchasing from the mining company more coal for its own consumption than the integrity of the plan permitted.

For the first two years (1902 and 1903) there were mined 95,932.95 tons in excess of the minimum, and thereafter there was a falling away each year in production from the minimum of enormous amounts of

coal—in 1904, more than 164,000 tons; in 1905, more than 306,000 tons; in 1906, nearly 252,000 tons; in 1907, more than 270,000 tons (the record not disclosing completely the deficits in each of the following years). And the evidence shows the railroad's average purchase of fuel coal for the ten years was 185,564 tons (estimating the last year on the average for the preceding nine years), representing a contribution of about $50,000, which is nearly $30,000 more than was consistent with the integrity of the plan. Primarily the plan failed because, and admittedly, the railroad company did not furnish the Hanna mining company cars necessary to transport the coal. The railroad company is therefore to blame for the failure of the plan and the consequent damage to the bondholders by reason of the nonpayment of the prior lien obligations and interest unpaid.

The railroad company, notwithstanding the failure of the plan because of its own wrongdoing, claims that in any event it can be required to pay only on the amount of coal actually mined and transported, as in its contribution contract it expressly agreed to pay, and that it is under no other obligation to the bondholders of its coal company. Can the railroad company, notwithstanding its culpability, escape legal liability to the bondholders?

The answer to the question depends, not only upon its express agreement to pay to the trustee of the bondholders the contribution on the amount of coal transported by it, but also on its relation to its coal company, to Hanna & Co., and their mining company, and to the plan of reorganization of the coal company, as well as upon the effect of the receipt by it under the plan of all of the stock of the coal company and the advantage accruing to it of a diminution, to the extent of 25 per cent., of the bonded debt of its old coal company. The obligations of Hanna mining company under the original agreement to pay royalties are not now involved and cannot be considered, for the reason that the bondholders have not appealed from, and in their brief acquiesce in, the judgment of the District Court in which the validity of the modification of June 2, 1908, by which Hanna & Co. and their mining company were absolved from the payment of royalties in default and the minimum was reduced to 550,000 tons a year, was established.

So far as the obligations of the railroad company rest upon express contract, they are found in its contribution agreement. This is drawn in such a way that it expressly obligates itself to pay only on "each ton of coal produced by the mines of said coal company and transported upon or over the road of said railroad company * * * until the entire principal and interest of such prior lien obligations should be paid and discharged." There is here no requirement to pay on at least 700,000 tons annually, or any specific number of tons. So far as express contract is concerned, the railroad company obligated itself to pay only on the amount Hanna & Co. mined and it transported, although the amount it transported depended solely upon itself. Nor can it be said that the circumstances raise an implied agreement for a contribution on at least 700,000 tons a year, because, the subject-matter being expressly agreed upon, no other agreement can be implied. Hawkins v. United States, 96 U. S. 689, 24 L. Ed. 607; Creighton v. To-

ledo, 18 Ohio St. 447. Nor can the railroad company be estopped from denying that it agreed to contribute on at least the minimum number of tons, because the bondholders must be held to have known, technically, at least, the extent of the railroad company's express contract liability to them, as disclosed by its agreement. If the bondholders must depend upon the express agreement alone, the elaborate plan devised by the railroad company, which seemed to promise so much to the bondholders and in reliance on which they were willing to, and did, scale their holdings against the railroad's coal property 25 per cent., and consent to the railroad company's ownership of all stock of its coal company as reorganized, was a mockery indeed.

Is it possible the bondholders have no remedy, and a court of justice is powerless to afford them relief? We think the rights of the bondholders do not altogether rest upon express contract. Granting that in the railroad company's agreement there was no limitation on the amount of coal it could take for fuel purposes, even if the amount it took was such encroachment upon the necessities of the plan as would result in reducing its contributions to a figure less than the amount the success of the plan required, and that no legal liability rested upon it to take only so much fuel coal as the integrity of the plan permitted, yet the fundamental fact underlay the plan and the various agreements that the railroad company would transport the coal.

It is obvious that the bondholders and Hanna & Co. would not have gone into the plan if they had not supposed and had not reason to suppose that the railroad company's equipment was sufficient for the purposes of the plan. Indeed, the railroad company made an express representation to Hanna & Co. of this fact. That a similar express representation was made to the bondholders or their committee does not appear, but we think an agreement with the bondholders to furnish sufficient cars to Hanna & Co. is implied from the circumstances of the case. The basis of the plan was the sufficiency of the equipment of the railroad company, a fact assumed as a matter of course—a fact which went with the plan—for without it the plan was a phantom, a framework of a plan, with form enough, but no substance. The situation is the same as if the railroad company had actually said to the bondholders that it would furnish sufficient cars to Hanna & Co. to carry the amount of coal Hanna & Co. agreed with it to mine.

It is no defense for the railroad company, against its own wrongdoing, to say that under the requirements of the Interstate Commerce Commission and the Ohio Railroad Commission and the decisions of courts it must distribute such cars as it had among all the coal operators on its line in the ratio of their relative needs; for this is not the case of an independent coal company or coal mining company operating on the line of a common carrier of freight whose supply of cars in times of shortage must be apportioned according to those requirements, for this coal company existed only on paper, and was owned and controlled by the railroad company. It made no move of its own volition, but was manipulated by the railroad company for its own purposes and in its own interests. But even if this is true, the bondholders

knew the relation of the railroad company to the coal company, and with that knowledge accepted the bonds. It, therefore, cannot be held that the prior lien obligations are the contract debt of the railroad company in the sense that it itself executed those obligations. Such a holding would necessarily involve the indebtedness of the railroad company on the bonds themselves. This the bondholders do not claim. No corporate form was used to deceive them. So far as express contract rights are concerned, the bondholders dealt with the coal company as a separate and distinct entity.

If the railroad company had permitted its coal company to manage its own affairs and deal with its creditors on terms of reorganization satisfactory to both, the relation of it to the coal company and its bondholders would be the same as to any other coal company along the line of its road, and this would probably be true even if it so happened that the railroad company owned all of the coal company's stock; but here the coal company had no vitality as a corporation. Its owner devised and brought about the plan of reorganization making a separate express agreement with the bondholders, and brought about the agreement with Hanna & Co. Both agreements were integral parts of the plan. The railroad company for its own ends thrust itself into a situation with which it had no concern, if its coal company had an existence separate from it. Its interference caused the bondholders to agree to give something to it in exchange for the benefits promised them by the plan. Its intermeddling brought it into a direct relation with the bondholders beyond and deeper than its express contract relation. That direct relation embodied the existence of a fact without which the bondholders would not have agreed to the plan, and in reliance upon which they have been subjected to loss. This fact was that the railroad company would haul away the coal mined, less what it bought for its own consumption. This fact, with the contribution agreement and the agreement to pay royalties, were the inducements to the acceptance of the plan and involved a tacit agreement by the railroad company to do the things it alone had the power to do to make the plan effective. When, therefore, the railroad company tendered the plan to the bondholders, it knew and they knew that its requirements involved an adequate supply of cars for transporting the coal. The railroad company, having brought about the Hanna mining company lease, directed the bondholders' committee to "go ahead with the reorganization." They did go ahead, and thereupon the bondholders, on their part, agreed that the railroad company should have all the stock of the coal company and the coal company should be excused from the payment of 25 per cent. of its bonded debt held by them. The bondholders complied with their agreement. The railroad company received the consideration. To now permit it to limit its liability to a contribution only on the coal actually transported by it, when the means of transportation were wholly in its own hands, would be to sanction conduct amounting to fraud on the bondholders.

We think the railroad company's liability can safely rest on an implied contract to furnish sufficient cars to transport at least the minimum. Nor is this conclusion wanting in harmony with the rule "ex-

pressum facit cessare tacitum," under which the railroad company claims that it is bound to do only that which it expressly agreed to do. That rule is not applicable here, because the express contract does not involve the same subject-matter. That was an express agreement to pay money as contributions on coal transported. This is an implied agreement to do that which, under the circumstances, the bondholders necessarily understood the railroad company would do. The bondholders are not suing for the amount the railroad company agreed to pay as contributions per ton on coal transported, but for damages for the failure of the railroad company to furnish cars to carry at least the amount of coal it required the mining company to mine. The implication arises from the nature and the circumstances of the case.

[2] That circumstances surrounding an express contract and what is to be performed under it may raise implied incidental agreements not directly involving the subject-matter expressly agreed upon is illustrated by a decision of this court in C. & O. Ry. Co. v. McKell, 209 Fed. 514, 522, 126 C. C. A. 336, 344. In that case there was an express contract, which in one aspect was an agreement by a railroad company to take all the coal on McKell's property, mined by him or his lessees, at a price, and to build a branch railroad on the property to reach the coal. The railroad company built the branch, but did not take all the coal contracted for. One of its defenses for its breach was that it was bound in law to impartially distribute its cars among all coal operators and had not enough to supply this particular operation. On this point Judge Denison said:

"We agree with the court below that, if this contract is to be treated as one for the purchase by the railroad company of its fuel coal, it implied the liability to furnish cars, and that the railroad's failure to provide cars to take away the fuel which it had bought and agreed to take when offered would be a breach of such contract, and that the full performance of defendant's duties as a common carrier in impartially distributing a fair supply of cars would be no answer to the breach. * * * "

In Lovering v. Coal Co., 54 Pa. 291, the Supreme Court of Pennsylvania held that, a coal company's railroad connecting its mines with navigation being notoriously its only means of transportation, all contracts with it for coal were made in view of that fact.

For a valuable consideration the railroad company furnished a plan to the bondholders, the success of which depended solely upon itself. It was indispensable to the working of the plan that it would furnish Hanna & Co. with sufficient cars to carry the coal. It was so understood by all interests concerned, and it was not necessary to expressly stipulate on such matters. In 2 Parsons on Contracts (7th Ed.) p. 646, it is said.

"The general ground of a legal implication is that the parties to the contract would have expressed that which the law implies, had they thought of it, or had they not supposed it was unnecessary to speak of it, because the law provided for it."

In 2 Elliott on Contracts, § 1360, it is said:

"The above rule, * * * that where there is an express contract the law will not imply one, is only applicable to those cases in which the ex-

press contract and that implied by law relate to the same subject-matter, and where the provisions of the express contract are intended to control and supersede those which would otherwise be raised by implication."

Judge Minshall in Railway Co. v. Gaffney, 65 Ohio St. 104, 114, 61 N. E. 152, 153, aptly defines the kind of implied contract dealt with here. He says:

"But contracts that are true contracts are frequently termed implied contracts, as where, from the facts and circumstances, a court or jury may fairly infer, as a matter of fact, that a contract existed between the parties, explanatory of the relation existing between them. Such implied contracts are not generically different from express contracts; the difference exists simply in the mode of proof. Express contracts are proved by showing that the terms were expressly agreed on by the parties, whilst in the other case the terms are inferred as a matter of fact from the evidence offered of the circumstances surrounding the parties, making it reasonable that a contract existed between them by tacit understanding."

By not providing sufficient cars to transport the minimum, and to that extent reducing the tonnage upon which it expressly contracted to make contributions to a figure at which the plan could not succeed, the railroad company broke its implied contract with the bondholders to transport at least the minimum, less fuel coal, and the measure of their damage is the loss to which they have been subjected by the breach. Apparently the loss, recoverable, as disclosed by the record, is the face of the prior lien obligations, less about 5 per cent., figuring royalties on the amount actually mined in 1902 and 1903, and on 700,-000 tons annually for the succeeding eight years, and agreed contributions on the balance each year, after deducting the amount of fuel coal bought that year by the railroad company for its own consumption.

But it is said by the railroad company that the adjudication of the validity of the modification was, since the bondholders were parties to the case, in effect a finding that it was within the power of the railroad company and its coal company, on the one side, and Hanna & Co. and their mining company, on the other, to do away by agreement with all the obligations of the Hanna mining company and the railroad's coal company, not only as between themselves, but also between the railroad company and the bondholders. The railroad company's claim is that in that adjudication were included any and every obligation by the railroad company to the bondholders not embraced in the express agreement for contributions.

We do not think this conclusion follows, for the reason that the rights of the bondholders asserted against the railroad company in this action were not directly in issue in that controversy, since the issues involved there and decided were between the railroad company, its coal company, and the Hanna mining company, and between the Hanna mining company, and the bondholders. In that controversy no issue was raised between the railroad company and the bondholders, for, if the court below had, in making its decision on the validity of the modification of the lease intended thereby to foreclose the bondholders against the railroad company, it could not have held, as it did, the bondholders entitled to require the railroad to pay the prior lien obligations before maturity.

If we are right in holding the railroad company obligated to pay the damage caused the bondholders by its failure to furnish sufficient cars, it is immaterial that it paid to the Mercantile Trust Company contributions, amounting to $54,578.73, or that its receiver advanced to the coal company $45,519.71, with which to pay interest on the coal company's funded debt, the only credits which, in its assignments of error, it claims the court below erred in not allowing to it. These, or any other payments on such accounts, are immaterial, for the reason that if the cars had been furnished under the implied agreement we have found to exist, to the extent and on the basis hereinbefore stated, the coal company's receipts, in royalties and contributions, would have been sufficient to have paid interest on prior lien obligations, interest on bonds, and taxes on real estate, and to have accumulated a sum only a few thousand dollars short of the face of the prior lien obligations, as hereinbefore shown.

Since the contribution was to continue until the prior lien obligations were paid, there can be no inequity in denying the application of the usual rule authorizing a receiver to elect not to be bound by a contract thought detrimental to his trust. The court below was right in setting aside its order discontinuing those payments. The claim of the railroad company to be excused from liability in any event, because of the clause in each of the bonds, "It is agreed by the holder of this bond that no recourse shall be had for its payment to the individual liability of any incorporator, stockholder, director, or officer of the Pittsburgh, Wheeling & Lake Erie Coal Company in any manner howsoever," cannot be maintained, because that provision undoubtedly has reference to what is known as the double liability of stockholders under the Constitution and laws of Ohio in force when the bonds were issued, and for the further reason that this suit is not maintained because the railroad company was the owner of all of the stock of its coal company, but, having received by the plan all the stock of the coal company and a reduction of that company's debts, it, in consideration of these, made the express and implied agreements dealt with herein.

As the court below expressly reserved questions of priority between the holders of prior lien obligations and other creditors of the railroad company not parties to this suit, transferring such question for final determination to case No. 7603 of the District Court of the United States for the Northern District of Ohio, Eastern Division, this decision does not interfere with, or affect in any way, the order of the District Court in that behalf.

The conclusion is that the judgment of the District Court on the questions involved in this appeal must be and is modified, and the case is remanded to that court, with instructions to ascertain, by reference to a master or otherwise, the exact amount due the bondholders by the railroad company on the basis of computation herein indicated, and to enter a decree in conformity with the views expressed in this opinion. The costs in this court will be divided equally between the parties to this appeal.