## NEW YORK TRUST CO. v. ISLAND OIL & TRANSPORT CORPORATION et al.
### No. 361.

Circuit Court of Appeals, Second Circuit.

July 28, 1930.

924

See, also, 33 F.(2d) 104.

Carter, Ledyard & Milburn, of New York City (Ralph Montgomery Arkush, Edwin DeT. Bechtel, and Tyler McKim Bartow, all of New York City, of counsel), for petitioner-appellant.

Kohlman & Austrian, of New York City (Francis L. Kohlman and Saul J. Lance, both of New York City, of counsel), for Arthur J. Stevens and H. Snowden Marshall, as receivers of Island Oil and Transport Corporation and of Island Oil Marketing Corporation, respondents-appellees.

Chadbourne, Hunt, Jaeckel & Brown, of New York City (William M. Chadbourne, Clinton De Witt Van Siclen and Alfred H. Phillips, all of New York City, of counsel), for committee representing the holders of the 8 per cent. and participating secured gold notes of Island Oil & Transport Corporation, respondent-appellee.

Hornblower, Miller & Garrison, of New York City (Charles A. Boston, of New York City, of counsel), for New York Trust Co., trustee under trust agreement securing the 8 per cent. and participating secured gold notes of Island Oil and Transport Corporation, respondent appellee.

Before MANTON, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

This is an appeal from an order of Judge Knox denying the petition of Irving Trust Company as receiver of Island Refining Corporation (hereafter called refining company) for leave to file its claim in the sum of $4,642,979.14, nunc pro tunc as of March 31, 1923, against the Island Oil & Transport Corporation (hereafter called transportation company).

Receivers in equity were appointed for transport company on March 20, 1922, and on January 27, 1923, an order was made directing the filing of claims against that company on or before March 31, 1923. Pursuant to this order Metropolitan Trust Company, as trustee under a mortgage executed by the refining company, filed a claim for damages in the sum of $12,375,249 arising out of an alleged breach by the transport company of a contract between it and its subsidiaries as sellers of crude oil and the refining company and its subsidiaries as buyers. The contract pursuant to a clause therein permitting assignment and pledge had been transferred by the refining company to the trust company as part of the security under its mortgage. A foreclosure of this mortgage was begun February 27, 1923, and a decree of foreclosure and sale was made whereby all existing causes of action in favor of the buyer for breaches of the contract purported to be conveyed on September 24, 1923, to the purchaser at the sale. These causes of action were transferred by mesne conveyances to Gulf Refining Company, which was thereafter placed in the hands of receivers. The Metropolitan Trust Company and the receivers of the Gulf Refining Company prosecuted the claim which the former had filed against the transport company.

In New York Trust Company v. Island Oil & Transport Corporation et al. (Ex parte Tumuly & Glass) 34 F.(2d) 649, 651, we dismissed the claim prosecuted by the Metropolitan Trust Company and the receivers of the Gulf Refining Company, and said:

"The pledge was for the mortgagee's benefit only after it had taken over the property, when it would become a profitable incident to the operation of the refineries. The profits meanwhile were like any others which might arise from the use of its property by the mortgagor, for it is the general rule that the usufruct of mortgaged property before default and possession, at least

in the absence of specific pledge, remains the property of the mortgagor. * * *

"The only remaining question is whether the claimants may press the claim in the interest of the buyer's receivers. The contract was in form assigned to the mortgagee as a whole, and later the existing causes of action were similarly conveyed under the decree. Nevertheless the intent of the assignment was not that before default and entry the mortgagee should receive the oil and redeliver it to the mortgagor. On the contrary, the mortgagor was directly to receive it, and it was only after entry that the mortgagee was to succeed him. * * *

"While, as we have said, the decree conveyed all existing causes of action, unless it was meant to be limited to those only which the mortgage actually covered, it unlawfully stripped the mortgagor's creditors of their 'separate right.' We ought not to assume that it was so intended; therefore the claimants got no more, either by the assignment or the decree, than such rights as the mortgagee could press in his own interest. It follows that the claim should be dismissed."

Judge Knox denied the application of Irving Trust Company as receiver of the refining company on the ground that the claims of any bondholders whom they represented were without merit and other creditors had "slept too long upon their rights." He said finally:

"I find myself unable to believe that there is sufficient substance in the claim to justify the trouble and expense incident to further hearings upon it; and which would be imposed in large measure upon another receivership estate." [1]

The contract of March 17, 1920, was made between the transport company and subsidiaries and the refining company and subsidiaries, was to continue until April, 1929, and provided that the former should sell to the latter such natural crude oil as it might require for its operations during the contract period up to a maximum of 50,000,000 barrels. The purchaser agreed to buy from the seller all the oil required for the operation of its proposed refineries in Louisiana, Mexico, and Cuba, up to the above maximum, and also such additional amounts as the operation of its plants might require if the seller was able, ready, and willing to supply it. The buyer was only to have the right to demand 450,000 barrels of oil per month and was so far as possible to give reasonable notice in advance of its monthly requirements. The price of the oil was to be 2 cents less than the current market price at the Mexican seaboard in any month in which delivery was due, but in no event to exceed 42 cents per barrel, and the buyer was to pay any export taxes on the oil. Delivery was to be made in Mexico at Palo Blanco on board ship or, at the election of the buyer, at the Mexican subsidiary of the buyer there. The buyer was to give ten days' notice to the seller of the probable arrival of steamers to be loaded at Palo Blanco. As part of the contract, the buyer agreed to make an advance payment to the seller of $3,000,000. At the election of the buyer 50 per cent. of the price of oil delivered by the seller could be credited against this advance which the seller agreed should be repaid in cash or by credits on account of oil delivered on or before January 1, 1923.

■ This advance of $3,000,000 which was made by the seller was fully repaid on August 31, 1921, sixteen months before it was due. Indeed repayments aggregating $2,-000,000 were made during the summer of 1920. The only assets with which the refining company started were the proceeds of the sale of its bonds amounting to $4,-831,590, from which the advance of $3,000,-000 to the transport company was made. It required $3,000,000 to construct its refining plant in Louisiana and $1,000,000 to build its Mexican refinery in Palo Blanco. It is therefore apparent that without the repayment of this advance long before it was due the refining company would have been unable to get into a position where it could refine oil that it might receive, much less where it could pay for its purchases or transport the crude oil to its Louisiana refinery or from its Mexican refinery to the market. This conclusion is not based on mere a priori reasoning but inevitably follows from what occurred, for the refining company up to the time that the advance of $3,000,000 was repaid on August 31, 1921, made practically no 50 per cent. payments on account of the oil that was shipped, but simply credited its entire purchases amounting, with taxes, to $649,993.30, against the $3,000,000 advance. Moreover, for financial reasons, it was unable to procure vessels to carry even the oil that it obtained, and it relied on the transport company, or its subsidiary, Island Oil Marketing Corporation, to guarantee the charters of the ships necessary for its very existence. But as the officers of the transport company and the refining company were

---

[1] Memorandum opinion.

practically identical and as the former owned all the stock of the latter, it is argued that they could not deal at arm's length, but that the transport company owed the refining company, or its creditors who appear here through Irving Trust Company, as receiver, a duty to observe strictly the terms of the contract and at all times to supply all the oil that the plants of the refining company could use.

It may be true that the transport company could have delivered more oil than it furnished the refining company. This seems to have been true except during the months of January, February, March, April, and May, 1921, when the Mexican plants of the transport company were shut down by force majeure and the seller had on hand much less crude oil than it supplied the refining company. The 545,918.50 barrels supplied were sold at an advance price. None of this oil, however, was paid for in cash according to the terms of the contract. The transport company was forced to arrange through its own credit for vessels to transport it, and was constantly asked to finance the refining company by paying off its $3,000,000 indebtedness long in advance of maturity. In these circumstances, we cannot regard the conduct of the transport company as inequitable or its executive officers as perpetrating a fraud because as representatives of the buyer they did not give the seller notice that the buyer required oil sufficient to operate at full capacity, or because, as representatives of the seller, they did not furnish the buyer with such an amount of oil. If, during the period prior to August 31, 1921, the transport company had not made enormous advances to the refining company, the latter could not have completed its plants and would have been unable to equip itself physically to do any business whatever. Likewise, if the transport company had not arranged for the chartering of vessels by pledging its own credit, the refining company could have transported no oil to its Louisiana refinery and that plant would have at all times lain idle. During all these times the refining company was not ready or able to perform. It is therefore idle to contend that the transport company violated its obligations. If it be said that the shipments of crude oil at more than 42 cents in January, February, March, April, and May, 1921, could not properly have been made, we repeat that they were not only the sole shipments claimed to have been made by the transport company at above 42 cents, but furthermore that they were far in excess of any oil the seller had on hand or was able to produce at the time and were made when the refining company was not paying for its oil in cash and was unable to charter vessels for transportation except by means of the guaranty of the transport company. The sales were made largely from oil other than that produced under the provisions of the contract.

From June, 1921, to November, 1921, inclusive, the transport company sold 726,-483.43 barrels of oil to the refining company at 42 cents and guaranteed charters of ships to transport it. In December, while the transport company was reaching the limit of its financial resources, the refining company was in weak condition, its oil was pledged in part to the transport company, and it finally had to shut down from lack of crude oil. On March 20, 1922, receivers were appointed of the transport company; on April 15, 1922, the refining company paid interest on its bonds in scrip; October 15, 1922, defaulted in interest on its bonds; and on January 16, 1923, was placed in the hands of receivers. If the transport company had not financed it from the beginning, it would have sold no oil and would have been in the hands of receivers long before. When the aid of the transport company ceased, its affairs rapidly went to pieces. Certainly prior to August 31, 1921, when the transport company advanced nearly $1,500,000 to the refining company, the latter was unable to take and pay for the amount of oil its plants could refine, and its officers were justified in making no requirements beyond the oil actually received. The most serious question is whether they were justified in doing this between September 1, 1921, and March 20, 1922, when the transport company receivership occurred. Viewed as representatives of separate entities, they were justified in doing what they did, if they acted fairly under all the circumstances. It may be said that the $3,000,000 advance had then been paid, that "the water was then over the dam," and that the matter must be treated as though no special accommodation had ever been given, even though it be plain that without it the refining company would never have been able to exist. But this would mean a technical position for one whose hypothesis is that the contract should always have been strictly observed for the benefit of the creditors of the refining company. It must be remembered that there was no notice by the latter of requirement of additional oil and *at law* there was no basis for a claim that the transport company had committed any

breach. When the basis for requiring different action by the officers of the refining company from that taken depends, not on legal rights, but on the judgment of a court of equity of what is fair and just, it seems reasonable, to take the whole course of events into consideration, to remember that the transport company had on August 31, 1921, parted with nearly $1,500,000 that it might have retained for sixteen months longer, had parted with about $1,500,000 more before that time in order to render necessary assistance to the refining company, was always obliged to guarantee charters for its benefit and at times to advance money on the oil the refining company had in storage. Under such conditions we are not persuaded that failure of the officers of the buyer to require larger deliveries and of the officers of the seller to make such deliveries affected the legal rights of the parties.

We do not reach this conclusion because the transport company was entitled to generosity for past favors, for it legally was not, but because, through its advances to and assistance of the refining company, all of which redounded to the benefit of the creditors of the refining company, it had itself got into such a precarious condition that the only hope of keeping the refining company afloat was for the latter to limit its requirements of crude oil for the time being. If the officers of the refining company had insisted upon full deliveries, they would have brought the whole edifice down at a time sooner than it actually fell. If they did not require deliveries equal to their capacity, there was a chance that by the survival of the transport company the refining company might too remain solvent and ultimately benefit from the 42-cent price. We believe, as the court and the master found in the prior case, that the action of the officers of the refining company was in good faith and was justifiable in all the circumstances. If it had not been in good faith, and if they had not believed that there was still a chance to save both companies, they would certainly have let the refining company go long before their own suspension and would not have advanced about $1,500,000 to the refining company toward the end of August, 1921—an advance which we repeat distinctly inured to the benefit of the creditors of the latter. Suppose the two companies had had entirely different officers and ownership. Would not the executives of the refining company have had the right to waive deliveries in the hope of saving the transport company, on whom they depended for deliveries of crude oil? They certainly would, and we cannot see that the situation differs here where the officers of the refining company acted in good faith.

The last period to be considered is that between March 20, 1922, when the receivers of the transport company were appointed, and January 16, 1923, when the refining company met its fate. The latter hung on during this period, unable to pay interest on its bonds to the amount of $385,000, with about $100,000 more interest accruing up to January 16. It did buy oil from the receivers of the transport company, but this oil was not purchased under the contract for the refining company. It neither received credit nor paid in cash, but liquidated its obligations through assignments of its accounts. It is said that its ultimate insolvency and its inability to do better after the completion of the Louisiana plant was due solely to the failure of the transport company to give it a steady supply of oil at 42 cents. Perhaps if it had had more capital, this might have been true, but it was involved in difficulties from the beginning, never became extricated from them, and finally went into the hands of a receiver. We are not satisfied that it was ever able to take and pay for more oil than it got without the continuous aid of the transport company.

But aside from this, the claim of damages for the period from March 20, 1922, is based upon an anticipatory breach due to the appointment of the receivers of the transport company. The breach only affected the refining company if it elected to treat it as a breach. It never evidenced any such election so that, as regards itself, no breach existed. Central Trust Co. v. Chicago Auditorium Ass'n, 240 U. S. 581, 36 S. Ct. 412, 60 L. Ed. 811, L. R. A. 1917B, 580; Samuels v. E. F. Drew & Co. (C. C. A.) 292 F. 734; Johnstone v. Milling, 16 Q. B. 461, at page 467. The refining company perhaps thought it was likely to gain little by exercising such an option, and regarded the chance of obtaining oil at 42 cents from a reorganized company as worth the risk of delay. At any rate, it neither adopted the breach nor demanded oil under the contract, nor gave notice of its requirements. Before it did anything in these matters, it was placed in the hands of receivers on January 16, 1923, and thereby disabled from performance on its own part. Under such circumstances, it cannot substantiate any claim to damages for the period succeeding March 20, 1922. If the refining company relies on a present breach by the transport company in failing

to deliver installments under the contract between March 20, 1922, and January 16, 1923, it has neither given any proof of notice to the transport company of its requirements of oil, nor has it demonstrated ability on its part to take and pay in cash for oil which might be delivered. If it seeks to prove its claim on the ground of an anticipatory breach, it has offered no proof of an election to treat the appointment of the receivers of the transport company as, such a breach.

From the foregoing, it seems apparent that none of the claims set up by the receiver of the refining company has real substance. The claim for each period abounds in all kinds of legal difficulties which we are inclined to regard as incompatible with any award of damages.

Clause nineteenth of the contract provided that the agreement could not be "cancelled or modified" without the consent of certain arbitrators specified in clause eighteenth. It may be argued that the nineteenth clause prevented the officers of the refining company from arranging to accept less than the maximum amount of oil which that company was able to refine. But this provision was patently for the benefit of the holders of bonds secured by the trust mortgage. It started out with the statement that it was contemplated that the agreement should be part of the security for the bonds. The trustee contended on the former appeal that the covenant was for his benefit and was held to have no claim. We think that the provision does not affect the rights of the receiver of the refining company.

The principal contention of the receiver is that there was an implied obligation on the part of the transport company to provide an adequate supply of oil for the refining company, that to effectuate this object it must supply the necessary funds to complete the plants, to furnish ships and in general to carry out the contract for the refining company. This implied obligation was sought to be derived from a circular of the refining company prepared by the transport company and sent to the subscribers for the bonds, in which it was stated that the transport company "will by contract assure to the Island Refining Corporation a constant and adequate supply of oil." Nothing was said about the price of the oil, and it was set forth that a subsidiary company was to own the refining plants to be constructed. This, we think, meant no more than that the transport company was to launch the business through a subsidiary company which was to issue the bonds secured by a mortgage on the plants, and was to attempt in good faith to make the business a success. It seems impossible to create from such a situation an obligation on the part of the transport company to finance the business out of its own coffers. The rights of the bondholders were contractual and depended on the enforcement of the agreement between the refining company and the transport company and not upon implied obligations. It is to be noted that the circular was that of the refining company and that transport company only acted as its intermediary in transmitting it to its voting trust certificate holders who became the subscribers for the bonds. Any other obligation than that arising from the terms of the contract would sound in tort and would be based on intentional wrongs by the transport company to the refining company. That the transport company should be agreeing to perform both sides of the contract seems an extravagant conception.

It is said that the transport company did not put forth an honest attempt to make the contract a success. It may have lacked financial resources and may have used poor judgment, but it financed the refining company as long as it could, and did its best for the refining company, as well as for itself, to promote the success of both companies whose affairs were inevitably interdependent.

The appellant relies on Wheeling & L. E. R. R. Co. v. Carpenter (C. C. A.) 218 F. 273, to support its theory of implied obligations. There the railroad had agreed with the bondholders of a subsidiary coal company to pay the trustee under the mortgage securing the bonds certain sums on each ton of coal mined "and transported upon or over the road of said railroad company." It refused to furnish cars to transport the coal, though its road was the only means of egress from the mines. The court held there was an implied obligation running to the trustee to furnish the cars. This would seem to have been an inevitable implication of the contract and one far from an obligation generally to perform the contract of the coal company, which would more nearly resemble the implied obligation sought to be raised in the present case.

We have not found it necessary to discuss numerous points argued on this appeal, such as the validity of the contract, the separate identity in law of the transport company and the refining company, or the ques-

tion whether the rights of the appellant have been in any sense determined in our former opinion. We have assumed that the claim asserted here was not passed on in our former opinion, that the contract upon which it is based was valid, and also that the right to allow proof of the claim rested in the reasonable discretion of the District Court and was not hopelessly barred by inexcusable laches. Upon this assumption, and after the examination of the record in the prior proceedings and the petition which Judge Knox denied, we are of the opinion that the claim is too unsubstantial to warrant the delay and expense of further litigation and that the discretion of the court below was fairly exercised.

Order affirmed.